THOMAS H. WICKES, Jr. *et al.*

*v.*

HUGH P. WALDEN *et al.*

*Opinion filed June 19, 1907.*

1. WILLS—*undue influence must be directly connected with the execution of will.* Undue influence, in order to avoid a will, must be directly connected with the execution of the instrument and be operating when the will is made.

2. SAME—*when the court may take question of undue influence from the jury.* The question of undue influence, in a will contest, is properly taken from the consideration of the jury where there is no evidence in the record even tending to show that any person said or did anything, at the time of the execution of the will, calculated to influence the testator to make any of the devises or bequests contained in the will or to prevent him from making any that he might choose.

3. SAME—*course of conduct inspiring affection and regard is not undue influence.* That a principal beneficiary in a will has by his course of upright conduct and long and faithful service in business relations inspired in the testator affection for such beneficiary and confidence in his integrity and business ability does not amount to undue influence.

4. SAME—*when instruction that every man is presumed to be of sound mind is proper.* In a will contest case, where the proponents have made out the *prima facie* case required by the law, it is proper to instruct the jury that every man is presumed to be of sound mind and capable of disposing of his property by will until the contrary is shown, and that it is their duty to hold that the testator was of sound mind and memory at the time of the execution of the will until they believe, from a preponderance of the evidence, that he was otherwise.

5. SAME—*when will must be upheld.* Where the preponderance of the evidence shows that the testator, at the time of executing his will, was of sound mind and memory and there is no evidence of undue influence, the will must be sustained, even though the evidence may show that the testator's conduct was not in accordance with good morals.

6. INSTRUCTIONS—*counsel should point out in his brief wherein instructions are erroneous.* Counsel should point out in his brief wherein instructions complained of are claimed to be erroneous or make some statement which shows to the court the basis of his objection, and if he fails to do so it is not the duty of a court of review to search for grounds upon which to declare the instructions erroneous.

7. SAME—*instructions should have basis in the evidence.* Instructions in a will contest announcing rules of law applicable to states of facts not appearing from the evidence to exist in the particular case, and instructions which are argumentative or which improperly single out and emphasize particular facts, are properly refused.

8. EVIDENCE—*divorced wife of testator cannot testify as to occurrences during marriage.* In a proceeding in chancery to set aside a will, a divorced wife of the testator is incompetent to testify to conversations or occurrences happening during the existence of the marriage relation which tend to overthrow the will.

9. APPEALS AND ERRORS—*when allowance of solicitor's fees can not be questioned on appeal.* A ruling of the trial court allowing solicitor's fees to the executors where the will sought to be set aside was sustained cannot be questioned on appeal, where the question was not among the points urged as grounds of the motion for new trial nor included in the assignments of error.

APPEAL from the Circuit Court of Cook county; the Hon. LOCKWOOD HONORE, Judge, presiding.

This is a bill filed by appellants to set aside an instrument purporting to be the last will of their father, Thomas H. Wickes, deceased, on the ground that at the time he signed it he was not of sound mind and memory and was unduly influenced. It is charged that the unsoundness of mind was caused by excessive indulgence in alcoholic liquors and also by a disease termed satyriasis,—that is, an inordinate desire for sexual gratification. Testator died March 28,

1905. His will, bearing date February 15, 1904, was admitted to probate in the probate court of Cook county on May 10, 1905. This bill was filed in the circuit court of Cook county on May 26, 1905, and thereafter an issue at law was made up as provided by statute and submitted to the jury whether the writing was the will of the testator or not. The defendants introduced in evidence the certificate of the oath of the witnesses at the time of the probate of the will, and both parties offered oral evidence at length in support of and against the allegations of said bill. At the close of the testimony, and before the arguments to the jury, the court gave, at the request of counsel for defendants, an instruction to the effect that there was no evidence in the case of any undue influence, and the jury were therefore instructed to disregard entirely that charge in arriving at their verdict. The jury on October 23, 1906, returned a verdict that the instrument in writing set out in the bill of complaint and introduced in evidence was the last will and testament of Thomas H. Wickes, deceased. After motion for new trial was overruled a decree was entered by the court on November 10, 1906, in accordance with this finding. From that decree an appeal was prayed to this court.

The will provides, in substance, as follows:

1. To testator's nephew, Hugh P. Walden, a residence on Prairie avenue, in Chicago, and five lots in Hammond, Indiana; "also my library, and also, for distribution by him among my relatives and friends, as he may see fit, my silverware, tableware, jewelry, pictures, and such other of my household goods as may be selected by him."

2. Gives to his executors all the rest and residue of his estate and directs that they convert the same into money, with full power to convey.

3. From the moneys so coming to their hands said executors to pay to the Northern Trust Company, as trustee, $100,000, upon the following trusts: (*a*) Said trustee to

invest said fund and from the net income to pay testator's son, Thomas H. Wickes, Jr., $500 per year during his lifetime, in equal quarterly installments, and at his death said annuity shall cease; (b) remainder of net income of said fund, after paying said $500, to be paid one-half to testator's daughter Laura Annette Wickes Felt and one-half to testator's daughter Florence Wickes Johnston, during the respective natural life of each; (c) upon the death of each daughter, respectively, the share of the income otherwise going to her shall be paid her lawful issue, and when all the children of said daughters shall have attained the age of twenty-one, said trustees shall pay to such children per capita, or to their descendants *per stirpes,* the principal from which such children, respectively, derive income; (d) upon the death of either daughter without leaving lawful issue, one-quarter of the fund to the Home for Destitute and Crippled Children and one-quarter to the Chicago Orphan Asylum; upon the death of the other daughter without leaving lawful issue, one-quarter of said fund to the Old People's Home and one-quarter to the Home for Friendless; (e) enough to be retained during son's lifetime to provide for his annual payment of $500; (f) none of said children or their issue shall have power to anticipate, alien or transfer any part of the income coming to them before actually received by them.

4. To the Northern Trust Company $25,000 in trust, to invest and pay the net income to the testator's brother, Charles B. Wickes, during his natural life, and upon his death $12,500 to St. Luke's Hospital, the income to be used to maintain free beds, and the other $12,500 in trust for the daughter of said Charles B. during her life, and on her death to go to the residuary estate.

5. To the Northern Trust Company $25,000 in trust, to invest and pay the income to testator's sister Mary Walden during her life, and at her death said $25,000 to go in equal shares to said sister's two daughters and their heirs.

6. Same amount in same manner for testator's sister Alice Crisp, her daughter and the latter's heirs.

7. To testator's nephew, Hugh P. Walden, $30,000, and to Richmond Dean $5000.

8. One thousand dollars each to the four institutions mentioned in "*d*" above.

9. Should the estate not be sufficient to carry out all of the bequests, each of them, except that in paragraph 1, shall be decreased in same proportion, but paragraph 1 shall not be affected thereby. No part to be intestate; all lapsed legacies to become part of residuary estate.

10. All the remainder to be divided into four equal parts,—one to niece, Annie Alice Bond, one to nephew, Hugh P. Walden, two to trustees for benefit of testator's two daughters, ultimate destination of said two parts as by paragraph 3.

11. Income to be paid to beneficiaries from time of testator's death, as far as may be.

12. Appoints Hugh P. Walden and William Burry executors, with Richmond Dean as alternate; no bond.

Executed February 15, 1904, in the presence of three witnesses. The estate appears to have amounted to something near $200,000.

WILLIAM P. BLACK, and MASON & MASON, for appellants.

FRANK H. SCOTT, and F. B. JOHNSTONE, for appellees.

Per CURIAM: In order to consider fairly the rulings of the trial court, both as to the admission and exclusion of testimony and the giving and refusal of instructions, it is necessary to state at some length and in some detail the evidence claimed to show undue influence and mental incapacity, alleged to have been caused by alcoholic and sexual indulgence.

The testator, Thomas H. Wickes, was born in 1846. In 1871 he married his first wife, Laura U. Wickes. Appellants are the children of this marriage,—Laura Annette Wickes Felt, aged at the time of the hearing thirty-four years; Thomas Harry Wickes, Jr., aged thirty-one; and Florence Lillian Johnston, aged twenty-nine. Neither daughter had children living at the time the will was made. The son had one child, a boy, aged eight at the time of the hearing. The testator, at the time of this marriage, was in the employ of the Pullman Company at St. Louis at a comparatively small salary. The family moved to Chicago in 1884, where testator rose step by step through several positions, including those of general superintendent and second vice-president, until at his death he was first vice-president of the Pullman Company. The first Mrs. Wickes was four years older than testator and had been married twice previous to her marriage with him, losing both her husbands by death. The testator's second wife was Clarissa A. Wickes. She testified that they first met on a train in 1893, when she was still married to a Mr. Croff, then living in Denver, and testator was still married to his first wife; that at the second meeting Wickes informed her that he intended to file a bill for divorce and suggested that she do likewise, and that after obtaining the divorces they should marry each other; that he dictated a letter which she wrote to her husband, stating that she had lost her affection for him and would not come back, and that on this letter and evidence of bad temper her husband secured a divorce from her, and Wickes having also secured a divorce from his wife, she and testator were married March 20, 1895. Testator's third wife was Edna Parker Wickes. They first met, according to her testimony, in 1900 (when she was a Mrs. Nelson) at a dinner party of four at a Chicago hotel. She testified that the same evening the four went to testator's house, his wife being in Europe and her husband not being present; that she afterwards visited testator at his

residence, sometimes alone, usually with others; that he solicited of her before their marriage an unnatural sexual relation; that she and testator each secured a divorce at testator's suggestion and were married about eleven months after their first meeting. She and testator were divorced from each other in 1904.

R. M. Patterson, one of appellants' witnesses, testified that he met Wickes casually on horseback rides along the boulevards and through the parks some eight or ten times during two years, from about 1902 to 1904; that on these occasions, as they rode together, Wickes continually made comments on the size or appearance of many of the ladies they passed and suggested that they "make dates" with them, which witness refused to do; that from testator's talk concerning women and his manner of looking at them the witness considered Wickes insane.

Frank C. Wickes, a nephew of testator, testified that one night when he and his uncle were staying with a man and wife in a three-room flat in St. Louis he awoke in the night and found testator and the woman in bed with him; that this woman visited testator at the sleeping car in which testator sometimes slept in St. Louis. These occurrences were said to have happened in 1878, when the witness was about fifteen years of age and some twenty-six years before the making of the will.

Some testimony was offered concerning a certain Mrs. Sullivan, who it was claimed called at testator's house once in great agitation, because she claimed testator's affections towards her were "cooling off," and was pacified by testator. It was also testified to by one of the former wives that testator stated that he had maintained Mrs. Sullivan in an apartment house in New York about a year before and was now trying to get rid of her.

The above testimony, with some innuendoes scattered through the record, indicates the substance of all that appears in the evidence concerning testator's relations with

women and which is claimed as proof that he was afflicted with satyriasis.

It is also urged by appellants that testator was of unsound mind because of excessive indulgence in intoxicating liquors. Testator's first wife testified that she saw him drink many times in public places when they were together, but did not seem to be able to name with positiveness anyone who had been present on those occasions. She stated, however, that Mr. Martyn had seen him intoxicated, and she believed that Mr. Newell and Mr. Lihou had also seen him in that condition. Both Newell and Martyn, who had known testator intimately in St. Louis and elsewhere from the early seventies up to the time of his death, testified that they had never seen him under the influence of liquor. Lihou, who had resided with the Wickes family in St. Louis and had known testator in Chicago since, stated that he had never seen testator under the influence of liquor, either at the office or in his home or elsewhere. Testator's second wife testified that during the year before she married him she saw him intoxicated many times, and that she frequently drank with him herself. The third wife stated that he drank a great deal, and that she saw him drunk four times during the eleven months before their marriage, three of these times at his residence. Neither of these former wives was permitted to testify as to what took place during the time they were married to testator, except as to what took place in public: Mackrall, a former coachman of testator during 1901 and 1902, stated that his employer drank a lot; that every night witness used to place, by instruction, in the suite occupied by testator and his wife, a pail containing from four to six bottles of beer, a bottle of whisky, some ice, two or three bottles of mineral water and a bottle of buttermilk; that the next morning it would sometimes all be gone, sometimes a little gone, usually the whisky and mineral water gone and half the buttermilk. He also testified to several instances when he claimed testator was intoxicated when he

returned in the carriage in the evening; that he would get kind of riled and crazy-like when he had been drinking but that there was nothing crazy-like about him when he was sober. Dr. Monash testified that in the fall of 1903 testator had alcoholic gastritis and moderate cirrhosis of the liver. Frank C. Wickes testified that in St. Louis, years before, he had seen Wickes intoxicated, probably on an average of once or twice a week. On the other hand, a large number of witnesses testified as to testator's strong personality and ability, and while several stated that he occasionally drank a glass or two of liquor, the decided preponderance of their testimony is that he was not a hard drinker, and even those who did know of his taking an occasional glass stated very emphatically that he had great ability, quick and correct judgment in business matters and strong force of character, which apparently lasted down to the very day of his death. Dr. Parsons, his physician during about the last year and a half of his life, testified that he attended him from the time the change was made from Dr. Monash, as elsewhere stated herein, up to testator's death, and also had considerable social intercourse with him; that testator did not drink anything, to witness' knowledge, for the seventeen months prior to his death; that he, as testator's physician, did not allow him to do so; that the testator's judgment, perception and decisions were perfectly sound, and that he never alluded to anything lewd or lascivious; that gastritis and cirrhosis of the liver were generally caused by alcoholic liquors, but he did not find that condition in testator. Mr. Wickes continued his daily routine as vice-president of the Pullman Company up to the time of his death. His housekeeper stated that testator usually left his home for the office between eight and nine in the morning; that on the day he died he delayed a short time at the request of Dr. Parsons, who wanted him to see a new saddle horse, and while waiting he played with the dog in the dooryard. In about three-quarters of an hour after leaving the house he returned,

looking very pale, and laid down on the couch. In about thirty minutes he was dead. The testimony is that he died from acute indigestion.

Two physicians were called as expert witnesses by appellants, and they testified, in answer to a hypothetical question containing a large number of premises, that in their judgment, on the facts stated in that question, testator was of unsound mind. One of them, on cross-examination, admitted that the facts as shown in this record as to his business capacity and habits were inconsistent with testator's being of unsound mind. Dr. Monash was called by appellants to testify. He had been testator's physician during most of 1903. He was not asked as to testator's mental condition. The physician called by appellees as an expert heard all the evidence introduced by appellants tending to show unsoundness of mind, and he testified that from this evidence he believed that testator was of sound mind. Both Dr. Parsons and Dr. Harsha, who had treated testator in a professional capacity, testified that they believed him of sound mind.

Appellants asked some nine instructions, the refusal of which they urge as error, stating in their brief in support of this contention: "All of the refused instructions above quoted are, and each of them is, supported by decisions of courts of the highest respectability; but in view of the manifest reasonableness and justice of the principles of law enunciated in these instructions we do not here cite or quote from such decisions, as, in our judgment, to do so would imply a reflection upon the legal learning of this court." However flattering this method of suggesting error in the record may be to our self-esteem, it is not very helpful in assisting the court to reach a correct conclusion on the instructions in question. We have repeatedly held that if counsel in their brief and argument do not point out wherein an instruction is erroneous, or make a statement by which this court can know upon what basis or for what reason the

228—5

trial court's action was erroneous, it is no part of our duty to search for these errors or enter upon an independent investigation of the court's own motion in order to find material on which to base a judgment of reversal. (*Jacksonville and St. Louis Railway Co.* v. *Wilhite,* 209 Ill. 84; *Duggan* v. *Ryan,* 211 id. 133.) Notwithstanding this failure to point out why these instructions should have been given, we will briefly review the questions raised by them.

The first of the refused instructions complained of refers to "a will made by one so excited by present intoxication as not to be master of himself," etc. There is not the slightest testimony in the record tending to show that deceased was intoxicated at the time of executing the will or that he had been within a year of the time when it was executed. The next instruction states "that under the law habitual drunkenness in an alleged testator is *prima facie* evidence that he was incapable of making a valid will," etc. We do not think there is any evidence in the record that would justify the giving of this instruction. The next instruction refers to a fixed mental disease, resulting from intemperate habits. Here, again, there was no evidence to support the instruction. Two other instructions referred to unfounded delusions concerning testator's near relatives. We do not think there is any evidence in the record that in the slightest manner tends to show that he had any such unfounded delusions. We shall discuss in another part of the opinion his relations with his children. Several of the instructions, including the last one of these nine now under discussion, referred to inequality of distribution of his property as an evidence that testator was not of sound mind and memory, the last one referring especially to the fact that the testator made no mention of his grandson in his will. Many of these instructions, including this last named, were objectionable because they improperly singled out particular facts. The viciousness of this practice has been repeatedly commented on by this court. (*McCartney* v. *McMullen,* 38 Ill.

237; *Callaghan* v. *Myers,* 89 id. 566; *Weston* v. *Teufel,* 213 id. 291.) Some of these instructions are also objectionable on the ground that they are argumentative. From our own independent examination of each of the instructions the refusal of which is assigned as error, we do not think such refusal was erroneous.

It is further urged by appellants that the court erred in instructing the jury that they should not consider the question of the improper restraint and undue influence as to the execution of the will. The improper restraint and undue influence are charged against testator's nephew, Hugh P. Walden, one of the appellees herein and an executor and beneficiary under the will. Walden was taken into testator's family about 1884, when testator moved from St. Louis to Chicago, and had for some time prior to Wickes' death been his private secretary. The grounds upon which undue influence is claimed are substantially as follows: About a month after the will was executed, O. S. Newell, a district superintendent of the Pullman Company in Texas, who had known testator since 1871, visited him in Chicago. During a long and intimate conversation about various affairs, testator told Newell some of the details of the will, referring to the provision made for Walden. Newell testified that Wickes stated that he had tried to look after Walden, who had been loyal to him practically all of his life and who had remained with him when he might have gone with some other company to a better position, because he knew that his uncle (Wickes) could not well get along without him; that he (testator) had tried to pay his nephew in this way. This testimony was offered on behalf of the defendants, and not to show undue influence. Newell also testified that he considered that testator had one of the greatest minds of any man he ever met; that he was quick and could see both sides, and was always correct in judgment.

The further claim is made as to undue influence, that in 1899,—some five years before the will was made,—Newell

wrote Walden a letter containing a long account of young
Wickes' doings or alleged doings in Texas, where he
(Wickes, Jr.,) was occupying a minor position with the
Pullman Company, having been taken there, as the testi-
mony shows, by Newell in order to relieve his father, the
testator, of the trouble that Wickes, Jr., was giving him.
In this letter Newell stated: "As you are thoroughly with
and entirely in the confidence of your uncle, I think it well
for you to know just how Harry has been doing, and I leave
it entirely to your discretion as to what you should say to
your uncle about it." A letter was also introduced from
Newell to Walden in which the former expressed a desire
to retain the full amount of territory then under his charge
and not have it reduced. In response to questions, on cross-
examination, by appellants, Newell stated that he wrote this
last letter to Walden rather that to Wickes himself, thinking
perhaps the former might in conversation with Mr. Wickes
suggest something of the kind. As to the reason for send-
ing the letter about Harry Wickes' doings in Texas to Wal-
den, Newell testified, on cross-examination: "He was in
his uncle's confidence, and he knew whether it would be best
or not" to report the complaints to Harry's father. It ap-
pears from the record Walden did think best to forward
the letter to Mr. Wickes, who was then in New York City.

Appellants urge also as evidence of undue influence, that
Dr. Monash testified that in the fall of 1903 he was called
as a physician to treat testator, and told him that he should
delegate as much as possible his every-day work with the
Pullman Company to others for a time, whereupon Mr.
Wickes replied that he was well seconded by his private
secretary, Walden, who could look after things in his ab-
sence. Dr. Monash further testified that some time there-
after Mr. Wickes told him that Mr. Walden was anxious
to have his physician, Dr. Parsons, called into conference,
which was done; that for several days he (Dr. Monash)
continued his care of testator, following Dr. Parsons' sug-

gestions, and that then Mr. Wickes told him, very pleasantly, that Mr. Walden was very anxious,—in fact, insisted,—that Dr. Parsons should have sole treatment of the case, whereupon he discontinued his attendance. Mrs. Tweedie, testator's housekeeper at the time of his death and for some time previous, testified that testator said to her, about the time he changed doctors, that he was not satisfied with the treatment of his case by Dr. Monash and asked her to recommend another physician. She did not do this, but shortly thereafter Dr. Parsons was called into conference and testator commenced taking his medicine; that testator stated to her: "I am taking Dr. Parsons' medicine, and about all Dr. Monash could do, anyway, is to take my pulse and look over the nurse's chart, and I don't see why I should retain him for that purpose." Martyn's testimony strongly tends to uphold Mrs. Tweedie as to the change of doctors, and Dr. Parsons' testimony, while not going into the reasons for the change, is entirely consistent with Mrs. Tweedie's as to why it was made.

These matters, outside of the contents of the will itself, constituted substantially all the evidence in the record that is claimed to show undue influence. It is true that Walden is one of the chief beneficiaries in the will, but it is plain from testator's conversation with Newell as to the provisions of the will affecting Walden, as well as from other evidence in the case, that the testator believed he had reason to remember the loyalty and faithful service of his nephew, who had been practically a member of his family and most closely associated with him in work for twenty years. The great weight of the evidence shows that the son, Thomas H. Wickes, Jr., had again and again failed to take advantage of opportunities given him by his father; that testator had tried to educate him by sending him to school, but the boy was not inclined to obtain an education, and that the father had set him up in business more than once and the son had failed; that through his influence the son had obtained vari-

ous positions but had apparently succeeded in none of them. There were many letters introduced in evidence showing conclusively that up to the time the son turned against his father, charging him in open court with fraud and dishonesty and announcing that he was ready to testify against him in divorce proceedings, the testator had taken the deepest and most fatherly interest in advising and assisting his son in every way, and even after the young man had turned against his father the testimony shows that the latter still assisted his son financially. The record, also discloses that testator had treated his daughters with great kindness and that he had been anxious for them to succeed, and tried to keep them in school, but without success; that they had gone onto the stage over his objection, but after they had decided to do that he was anxious for them to succeed there. The provisions of the will show that he was trying to look after and care for them. He had told some of his friends, in talking about the provisions of the will after it was drawn, that it was a hard thing for a woman to go out and battle in the world, and he wanted to see that his daughters were properly cared for and in such a way that they could not "run through with it," but that his son, who had treated him very badly, did not deserve or need the same consideration; that he was going to leave enough to him so he would not have to go to the poor-house. All of these facts must be taken into consideration in considering the claim of appellants that the provisions of the will were of such a nature as to indicate undue influence on the part of the nephew, Walden. The evidence in this record as to the relations of testator with his children, and as to the long, conscientious and faithful service of the nephew, justifies the provisions of the will as to all these parties. There is nothing, in our judgment, that indicates in the slightest degree any undue influence was exercised by the nephew, Walden, or anyone in his behalf. If Newell's letter, as it is claimed, indicated that he thought Walden had

influence over the testator, it would be, at the most, merely a matter of opinion. It was the most natural thing in the world for Newell to write this letter to the confidential assistant, who he thought would have the ear of the testator and could aid him in retaining his full amount of territory. Then, too, all the things that are claimed to show undue influence took place long before the making of the will. The letters of Newell were written in 1899; the change of doctors, alleged to be brought about by the nephew, took place over three months before the will was executed. We have held that undue influence, to avoid a will, must be directly connected with the execution of the instrument and operating when it is made. (*Guild* v. *Hull,* 127 Ill. 523; *Francis* v. *Wilkinson,* 147 id. 370.) We have also held on this question that it was properly taken from the consideration of the jury when there was no evidence in the record which, with all the reasonable inferences and intendments fairly to be drawn therefrom, tended to prove that the testator was at the time of the execution of the will unduly influenced to execute that will. (*Woodman* v. *Illinois Trust and Savings Bank,* 211 Ill. 578.) There is not a syllable of evidence even tending to show that Walden, or any party to this cause, or anyone else, unduly influenced or attempted to unduly influence the making of the will, or said or did anything whatever at the time of its execution in any way calculated to influence the testator to make any of the devises or bequests therein mentioned or to neglect to make other provisions. As we held in *Woodman* v. *Illinois Trust and Savings Bank, supra,* under such a state of facts the question of undue influence was properly taken from the jury by the court, and the court properly gave the instruction complained of by appellants. This being so, all other instructions urged as error by appellants which refer in any way to the question of undue influence were rightly refused.

Appellants further claim that the trial court erred in giving to the jury instruction 14, which reads:

"The law presumes, and it is your duty to presume, that every man who has arrived at years of discretion is of sound mind and memory and capable of transacting ordinary business and capable of disposing of his property, by will or otherwise, until the contrary is shown; and it is your duty to hold that Thomas H. Wickes, at the time he executed the paper offered in evidence, was of sound mind and memory, and to so hold until you believe, from a preponderance or greater weight of all the evidence, that he was otherwise."

The *prima facie* case was made out for appellees by introducing the certified copy of the testimony given in the probate court when the will was admitted to probate. There is no claim that such testimony was not full and complete. This being so, under the authority of *Craig* v. *Southard,* 162 Ill. 209, there was no error in giving this instruction. Appellants admit that in this last case an instruction was given which was largely the same in wording as this instruction 14, but insist that the words "in the first instance," found in the instruction given in *Craig* v. *Southard, supra,* (p. 213,) materially change the meaning of the instruction. We think the difference in the two instructions is not material. This court has upheld the rule of law laid down in this instruction in the following cases: *Wilbur* v. *Wilbur,* 129 Ill. 392; *Egbers* v. *Egbers,* 177 id. 82; *Baker* v. *Baker,* 202 id. 595; see, also, *Leonard* v. *Burtle,* 226 id. 422.

It is earnestly insisted that the trial court improperly excluded the testimony of the divorced wives of the testator as to occurrences and conversations during coverture. This court has held that on grounds of public policy, and wholly independent of statute, neither the husband nor wife at the common law could testify to communications and conversations occurring between them during coverture, and that this inability continues even after the marriage relation is severed, either by divorce or death. (*Goelz* v. *Goelz,* 157 Ill. 33.) To the same effect are *Reeves* v. *Herr,* 59 Ill. 81, *Geer* v. *Goudy,* 174 id. 514, and *Sloan* v. *Sloan,* 184 id. 579.

In this connection the appellants also complain that the court refused to allow appellants to testify in refutation of charges as to certain acts which witnesses for appellees had testified were stated to them by testator in the absence of appellants. These appellants were incompetent, under the statute, to so testify, and the court properly ruled that they could not testify. (Hurd's Stat. chap. 51, sec. 2, p. 1034; *Brace* v. *Black*, 125 Ill. 33; *Waugh* v. *Moan*, 200 id. 298.) The wife of appellant Thomas H. Wickes, Jr., was also incompetent under the same statute. *Treleaven* v. *Dixon*, 119 Ill. 548; *Bevelot* v. *Lestrade*, 153 id. 625.

The trial court allowed solicitor's fees for the executors in the trial of this case, and this is alleged as error. A careful examination of the points urged by appellants in their motion for a new trial, as well as those stated in their assignment of errors, shows that this question was not raised on the motion for new trial or by assignment of error. Even though the trial court ruled improperly on this question appellants are not in a position to take advantage of that ruling. (*Lasher* v. *Colton*, 225 Ill. 234, and cases there cited.) The same remarks apply as to the witness fees allowed Dr. Sanger Brown, Newell and Martyn.

Whatever weaknesses the testator had, as shown by this record, in reference to his attentions to women, his hasty marriages and equally hasty divorces, this one fact is written very plainly upon every page of the record: that he was regarded by his business associates, and by many of those with whom he came in contact socially, as a man of unusually positive character, with strong convictions and remarkable executive ability, although amenable to reason when convinced that he was mistaken. His progress, unaided by anything but his own exertions, from a minor position to the vice-presidency and general managing officer of a great corporation indicates this. During the last years of his life he had charge of the operating and manufacturing departments of that company. This included the opera-

tion of several thousand cars and the direction of from eight to ten thousand employees engaged in car building. Dr. Parsons, his physician; Woods, an agent for a railway spring company; Dunbar, manager of the Pullman car works; Ristine, a railway expert; Hampton, upholstering foreman of the Pullman Company; Mansure, a manufacturer; Newell, some of whose testimony has been mentioned; Goodnow, general manager of a railroad; Bird, assistant auditor of the Pullman Company; Brightaupt, foreman painter for that company; Lihou, an employee of the company; Sollitt, a contractor; Ripley, president of a railroad; Harris, another railroad president; Field, president of an ice company; Smith, a publisher; Charlton, a general passenger agent; Father Tinan, a clergyman; Brown, treasurer of the Pullman Company; Martyn, a division superintendent of that company; Dr. Harsha, testator's former physician; Ettinger, a retired manufacturer; Sweet, secretary to the president of the Pullman Company,—all testified that they believed testator was of sound mind and memory. His relations with women may not have been in accordance with the well recognized standards of society, and if that were the sole issue in these proceedings we would be compelled to hold that the evidence in this record tended to show that they were not in accordance with good morals. But that is not the issue. We think the great preponderance of evidence upholds the finding of the jury that testator was of sound mind and memory when he executed this will.

The bill of exceptions was amended by the lower court after the cause was brought to this court. After a somewhat careful examination of the question we think the trial court ruled correctly on this question. In view of our conclusions as set forth in the foregoing opinion on the other branches of the case we deem it unnecessary to discuss at length the law covering this amendment.

Finding no reversible error in the record the decree of the circuit court will be affirmed.  *Decree affirmed.*