(No. 13005.—Reversed and remanded.)

JOHN ELMER DAUGHERTY *et al.* Appellees, *vs.* THE STATE
SAVINGS, LOAN AND TRUST COMPANY *et al.* Appellants.

*Opinion filed February 18, 1920—Rehearing denied April 8, 1920.*

1. WILLS—*will may be sustained although testator was guilty of immoral conduct—evidence.* Where the weight of evidence in a suit to contest a will is that the testator was of sound mind when he executed his will, the will will be sustained even if it be shown he was guilty of immoral conduct; and exhibits which witnesses testify the testator kept for the purpose of overcoming sexual impotency are not admissible in evidence.

2. SAME—*burden is on contestants to overcome case made by proponents.* In a will contest case the burden is on the contestants to overcome, by a preponderance of the evidence, the case made by the proponents.

3. SAME—*when verdict in a will contest case will be set aside.* The verdict in a will contest case has the same force and effect as a verdict in an action at law and when sanctioned by the trial court is entitled to great weight, but where the record shows the verdict is against the clear weight and preponderance of the evidence it will be set aside, the same as in a case at law.

4. SAME—*what does not show undue influence by the party who drew will.* Where there is no proof that the party who drew the will ever advised or suggested the making of any of its provisions, the mere fact that institutions in which said party was interested received substantial benefits from the will does not support the claim of undue influence.

APPEAL from the Circuit Court of Adams county; the Hon. ALBERT AKERS, Judge, presiding.

WILLIAM SCHLAGENHAUF, and GOVERT & LANCASTER, for appellants.

J. T. INGHRAM, C. B. BERTER, and HUBBARD & GROVES, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

John Elmer Daugherty and Frank Daugherty filed their bill in chancery in the circuit court of Adams county to contest and set aside the will of their father, John M. Daugh-

erty, on the alleged ground that the testator was not of sound mind and memory at the time he executed the will and that he was induced to execute it through the undue influence of S. B. Montgomery, who was a stockholder and officer in the State Savings, Loan and Trust Company and president of the board of directors of Blessing Hospital, in Quincy, Illinois, chief beneficiary of the will. The State Savings, Loan and Trust Company, both in its private capacity and as executor of the will, and Blessing Hospital, were made defendants. They filed an answer denying the allegations of the bill as to the unsoundness of mind and undue influence. Three issues of fact were submitted to trial by the jury: (1) Was the instrument purporting to be the will of John M. Daugherty his will? (2) Was he at the time of its execution of sound mind and memory? (3) Was its execution the result of undue influence of S. B. Montgomery? At the conclusion of the evidence the court instructed the jury to find for proponents of the will on the issue of undue influence and submitted the form of their verdict on that issue, but the jury made no finding in their verdict on that issue and returned a verdict finding the instrument purporting to be the last will of John M. Daugherty was not his last will and testament. Proponents filed a motion for a new trial, which the court overruled and entered a decree declaring the will to be null and void and setting aside and annulling the probate thereof. Proponents have prosecuted this appeal from that decree.

John M. Daugherty was a farmer in Adams county, Illinois, and lived on his farm until a few days before his death, when he was taken to Blessing Hospital, in Quincy, where he died on January 27, 1917, at the age of about eighty-two years. He had been married in early life and had two sons. In 1891 or 1892 he had trouble with his wife and they separated. Subsequently they were divorced. The mother and two sons left the farm and for most of the time thereafter until testator's death they did not live

with him on the farm.  His wife never lived with him on the farm after the divorce and died a few years before he did.  The will was executed March 8, 1905.  By his will the testator devised and bequeathed to the State Savings, Loan and Trust Company of Quincy, Illinois, all his estate, real and personal, to be controlled, managed and invested to the best advantage and the net income divided into three equal portions, one of which was to be paid to the testator's son John, one portion to his son Frank and the other portion to Blessing Hospital, annually.  At the death of either son the portion set apart for him was to be paid to Blessing Hospital, and after the death of both sons the entire net income was to be paid to said hospital.  The will further provided that the entire net income should be paid to Blessing Hospital for a period of twenty years after the death of the last surviving son, and at the expiration of that time the entire estate was to be conveyed to the hospital to be held as an endowment fund, the income only to be used by the hospital, the *corpus* of the estate to be held by said hospital and called the "John M. Daugherty Fund." The State Savings, Loan and Trust Company was appointed executor of the will.  Jacob Perry and his wife were employed by the testator at so much per day and lived on the farm with him from 1894 to 1904.  He boarded with them and paid for his board by furnishing them house, garden, orchard and use of cows.  A Mr. Hughes and wife, Anna, lived with the testator on his farm from February, 1905, to the late fall of 1906.

Proponents proved by a large number of witnesses, acquaintances of testator for many years, many of whom had transacted business with him, that he was of sound mind when the will was executed.  These witnesses included bankers, merchants, farmers, lawyers, public officials, tenants and others.  In addition to proving he was capable of transacting and did transact his own business, such as buying and selling land, making loans, renting property and collecting

the rents, insuring his buildings and directing and managing the cultivation of his farm, he occupied positions of trust in relation to other parties, such as guardian, administrator and conservator, and discharged the duties of those positions, making reports to the county court of his actions and doings in an intelligent manner. He was appointed by the county court to some of these trust positions about the time he executed the will and continued to act and make reports as late as 1912. There were but three witnesses who testified for contestants that the testator was not of sound mind in 1905. One of the contestants' witnesses who had known testator all his life testified he was of unsound mind the last six years of his life; that the peculiarities of testator upon which he based his opinion did not extend back of six years prior to the testator's death. The three witnesses who testified to the testator's unsoundness of mind in 1905 were Mrs. Perry, who lived in the house on the farm with testator from 1894 to 1904; Mrs. Hughes, who lived there from February, 1905, to the late fall of 1906; and Dr. Beirne, who never saw the testator but who heard the testimony of Mrs. Perry and Mrs. Hughes and based his opinion that the testator was insane on their testimony. During the time Mrs. Perry and Mrs. Hughes lived at testator's farm the testator was transacting all his business, including the control and management of his farm, the same as he had always done. He was a school director and a trustee of his church and attended to the duties of those offices. The overwhelming weight of the proof is that he was not of unsound mind.

Contestants' position, as disclosed by their brief, is, that the testator was not generally insane; that he was capable of transacting business but that he was insane on the subject of his family and the objects of his bounty. It is asserted that the witnesses who lived with him and discussed his family with him testified he was of unsound mind, while those who did business with him but never discussed his

family testified he was sound until the last few years of his life, and it is claimed on the subject of his family he was insane for nine years before the will was executed. There is not one word of proof on the part of contestants to support that position. None of their witnesses testified to discussions with the testator of his family and his state of mind with respect to them. They based their opinions on acts and conduct of the testator having no relation whatever to his family. The proof fails to show the testator entertained any insane delusion or even unfriendly feeling toward his sons. It appears from the testimony of some of proponents' witnesses that the testator complained of his sons going with the mother when the separation occurred, but he always spoke well of them. His wife, after the separation, went to some western State to live and he heard she had become blind. He expressed the intention that she should not suffer, and either went to see or caused inquiry to be made whether the report was true and found it was not. His son Frank is married and has children. The son John is a bachelor. Neither of the sons was living with their father when the will was made and never afterwards lived with him except for a short period the last years of his life. We fail to find any proof to sustain the claim that the testator was insane on the subject of his family or that he entertained any insane delusion on that subject.

Contestants offered in evidence and exhibited at the trial certain exhibits, which the court refused to admit. Mrs. Perry testified she saw them in the house while she lived on the Daugherty farm,—some in the attic and some in testator's desk in the sitting room of the residence. Three of them, which she said she saw in the attic, were said by Dr. Beirne to be for use for the "hopeful purpose" of overcoming sexual impotency, and the other exhibits were circulars explaining their use, which the witness said she saw in testator's desk. Mrs. Hughes testified she saw the exhibits that were in the attic but not those in the desk. No

one ever saw testator have them or heard him speak about them. There were frequently hired men in the house,— sometimes more than one. The desk in which the exhibits were found was never locked, and they were not connected in any way with testator by the proof further than that they were seen in his house. Contestants have assigned cross-error on the ruling of the court in refusing to admit the exhibits in evidence, and say if the decree is reversed and the case remanded for a new trial they wish to have the question of the admissibility of those exhibits ruled on by this court. We are of opinion the court correctly ruled they were not admissible. The only basis for the contention that they were admissible is that Mrs. Perry testified to seeing testator commit the crime against nature with animals, and having the appliances referred to in the house further shows him to have been a sexual pervert and insane. That does not render the evidence competent. It is worthy of note that Mrs. Finney, a daughter of Mrs. Perry, who was fifteen years old when they went to live on testator's farm and lived there with her parents until she was married, at the age of twenty-one, never saw any of the things her mother said she saw, and the daughter considered testator of sound mind. But even if the testimony of Mrs. Perry as to the immoral acts of testator were admitted to be true, that would not be conclusive in favor of contestants on the question of soundness of mind. Where the weight and preponderance of the evidence are that a testator was of sound mind when he executed his will, it will be sustained even if it be shown he was guilty of immoral conduct. It may be said here, as was said in *Wickes* v. *Walden,* 228 Ill. 56, that whatever the weaknesses and practices of the testator may have been, he was regarded by his acquaintances and men with whom he transacted business as mentally strong and capable. (See, also, *Snell* v. *Weldon,* 239 Ill. 279.) The burden was on the contestants to overcome

the case made by proponents by a preponderance of the evidence. *Wickes* v. *Walden, supra,* and cases there cited.

Contestants correctly contend that the verdict in a will contest case has the same force and effect as a verdict in an action at law and when sanctioned by the trial court is entitled to great weight, and that the decree approving the verdict will not be set aside unless clearly against the weight of the evidence. We have held in many cases too numerous and too familiar to require citation, that where the record shows the verdict is against the clear weight and preponderance of the evidence it will be set aside, the same as in cases at law.

Contestants have assigned a cross-error on the ruling of the court directing the jury to find for proponents on the issue of undue influence. The only basis, if it can be said to be a basis at all, to support the claim of undue influence is that S. B. Montgomery, who drew the will, was a stockholder and officer of the banking institution made trustee and executor and an officer of the Blessing Hospital board. So far as the proof shows, testator went alone, on his own suggestion, to the bank and asked Montgomery to draw his will. Montgomery did so in a back room of the bank, and when it was completed two employees of the bank were called into the room and testator told them the document was his will and asked them to sign as witnesses, which they did. There is no proof that Montgomery ever advised or suggested the making of the will or any of its provisions, and the mere fact that institutions in which he was interested received substantial benefits from the will, under all the authorities does not support the claim of undue influence.

The decree is reversed and the cause remanded.

*Reversed and remanded.*