(No. 15020.—Reversed and remanded.)
GEORGIA WOOD WILLIAMS, Appellee, *vs.* MINNIE J. RAG-
LAND *et al.*—(FRANK B. STOUFFER *et al.* Appellants.)

*Opinion filed February 21, 1923—Rehearing denied April 6, 1923.*

1. WILLS—*when presumption of undue influence arises from a
fiduciary relation of scrivener.* The existence of a fiduciary rela-
tion between the testator and the scrivener, who was the dominant
party and who receives a substantial benefit as a legatee or devi-
see under the will, raises the presumption that the will is the result
of undue influence, and proof of these facts, standing undisputed,
will justify a verdict finding that the writing is not the will of
·the testator.

2. SAME—*what does not, alone, raise presumption of undue in-
fluence.* The fact that the testatrix names her attorney, who wrote
the will, as one of the two executors and trustees, who are to have
as compensation six per cent of the gross income of the trust estate
per year, does not, alone, raise a presumption of undue influence to
be overcome by the proponents, where the total gross annual in-
come of the trust estate can amount to about $1100 only.

3. SAME—*contestant must prove charge of mental incapacity by
preponderance of the evidence.* One who contests a will upon the
ground of mental incapacity of the testatrix must prove by a pre-
ponderance of the evidence that the testatrix did not have sufficient
mental capacity to make a valid will at the time she executed the
one in contest.

4. SAME—*when a testatrix has testamentary capacity.* A testa-
trix has testamentary capacity if at the time of executing the will
she has sufficient mind and memory to enable her to understand
the particular business in which she is engaged, is able to remem-
ber who are the natural objects of her bounty, to recall to mind
her property, and to make disposition of it understandingly accord-
ing to some purpose or plan formed in her mind.

APPEAL from the Circuit Court of Sangamon county;
the Hon. FRANK W. BURTON, Judge, presiding.

JOHN G. FRIEDMEYER, and SAMPSON & GIFFIN, (CLAR-
ENCE A. JONES, and GEORGE M. GILLESPIE, guardians
*ad litem,*) for appellants.

THOMAS D. MASTERS, and WALTER T. DAY, for appellee.

Mr. CHIEF JUSTICE THOMPSON delivered the opinion of the court:

Jeanette E. Buck died testate in Springfield, November 15, 1918. Her husband had died in July of the same year and by his will she had become possessed of real estate of the value of $13,500. The total value of her estate at the time of her death was about $38,000. She left surviving her as her only heirs-at-law, two sisters (the complainant, Georgia Wood Williams, and the defendant Minnie J. Ragland,) and one nephew, George Park Johnson, the only child of a deceased sister. The last will of deceased was executed November 7, 1918. After directing the payment of debts and funeral expenses it provides for the erection of a monument at the head of the graves of herself and her deceased husband at a cost not to exceed $1500, and bequeaths $500 to the board of managers of Oak Ridge cemetery as an endowment fund for the perpetual care of the family lot. After making specific bequests of certain articles of personal property to her sisters and others, she bequeaths $1000 to her sister Minnie, $2500 to her friend Frank B. Stouffer, of Hagerstown, Maryland, $1000 to be divided equally between her friends Mr. and Mrs. J. D. Winters, $1000 to each of the five children of her brother-in-law, Fred Buck, and $1000 to her husband's nephew, Angelo Buck. She devises to Dr. Jay T. Wood, only son of her sister Georgia, a life estate in her home at 912 South Seventh street, Springfield, and the remainder in fee to his children. She names J. D. Winters and Louis G. Coleman trustees and executors of her will and bequeaths to them $6000 in trust, to be kept invested in income-bearing securities and the income therefrom to be paid to Dallas Case Ragland, only son of her sister Minnie, during his lifetime and after his death to his children until the youngest shall have reached the age of twenty-one years, whereupon the trust is to end and the sum of $6000 is to become the absolute property of his children. She bequeaths to the trus-

tees another $6000 to be held by them on the same terms, the income to be paid to George Park Johnson for life and the income and principal thereafter to go to his children. The remainder of her property, which amounts to about $6500, she bequeaths to the trustees to be held on the same terms, the income to be paid to Dr. Wood during his lifetime and thereafter the income and principal to go to his children. She provides that the total compensation to be paid the trustees shall not exceed six per cent each year of the gross income of the trust estate. The will was duly admitted to probate, and thereafter Georgia Wood Williams filed this suit in chancery to contest it on the ground that it had been procured by the undue influence of Louis G. Coleman and Mr. and Mrs. J. D. Winters and on the ground of mental incompetency of the testatrix. On the first trial the jury disagreed, and on the second trial they returned a verdict finding in complainant's favor on both grounds. From the decree entered on this verdict this appeal is prosecuted.

There was no proof that the will was procured by the undue influence of Mr. or Mrs. Winters, and the chancellor properly took that issue from the jury. There was no direct proof of undue influence exercised by Coleman, but the question was submitted to the jury on the ground that a confidential relation existed between Coleman and the testatrix, and that a presumption of undue influence arose from this relation and the terms of the will which he drafted. The proof shows that Coleman is an attorney in Springfield; that he had drafted a will for testatrix in September, 1918, and that he drafted the will in contest two months later. In the last will he was named as one of two executors and trustees but was not made a legatee or a devisee. With respect to this evidence the court gave to the jury instruction No. 34, which reads:

"The court instructs the jury that the relation of attorney and client is, as a matter of law, a relation of trust and

confidence and where such relation is shown to have existed, it is incumbent on the attorney to show that any transaction occurring during the existence of the relation was fairly transacted and that he took no advantage of the relation. And in this case if the jury shall believe from the preponderance of the evidence that on the seventh day of November, 1918, Louis G. Coleman was the attorney of Jeanette E. Buck, and that on that day he prepared the writing here offered as her will; that such writing was prepared by him in her absence; that he procured or brought the attesting witnesses to her home and was present at the time of the execution thereof, and at the time of the execution assisted therein, and that by the terms of the will he will profit in the execution of the trusts therein mentioned, then and in such case if the jury shall believe from the preponderance of the evidence the above matters, the burden is upon him to show that the writing in question is the deliberate will and wish of the said Jeanette E. Buck and that he did not, in the making thereof, or its execution suggest or influence the said Jeanette E. Buck to make or execute the same as to any part thereof; and if the jury shall believe that he has not so shown by the evidence, in the event the above matters have been proven, it will be the duty of the jury to return a verdict that said writing is not the last will and testament of the said Jeanette E. Buck, unless after a careful consideration of the above facts together with all the other evidence in the case the jury believe the said Jeanette E. Buck was not under the undue influence of the said Louis G. Coleman as explained in these instructions."

It is well established by the decisions of this court that where a fiduciary relation exists between the testator and the scrivener and the testator is the dependent and the scrivener the dominant party, and the testator reposes trust and confidence in the scrivener and the scrivener receives a substantial benefit as a legatee or devisee under the will, the presumption arises that the will is the result of undue in-

fluence exercised by the scrivener, and proof of these facts, standing alone and undisputed, will justify a verdict finding the writing produced not to be the will of the testator; (*Weston* v. *Teufel,* 213 Ill. 291; *Leonard* v. *Burtle,* 226 id. 422; *Yess* v. *Yess,* 255 id. 414; *Snyder* v. *Steele,* 287 id. 159; *Abbott* v. *Church,* 288 id. 91; *Appeal of Richmond,* 59 Conn. 226, 22 Atl. 82;) but the mere fact that an attorney or confidential friend who writes the will is named executor and trustee does not, alone, raise a legal presumption of undue influence. 2 Jones on Evidence, sec. 191; *Appeal of Livingston,* 63 Conn. 62, 26 Atl. 470; *Linton's Appeal,* 104 Pa. St. 228.

The point raised by the objection to this instruction has not been squarely decided by any decision of this court. In *Compher* v. *Browning,* 219 Ill. 429, *Appeal of Livingston, supra,* was cited with approval. In that case one McKenney, who for several years had been the confidential business agent of testatrix, procured an attorney to draw her will, and under the terms of this will he was named as one of two executors and trustees. It was pointed out in that case that McKenney received no legacy or devise under the will and that all the pecuniary benefits coming to him would be the compensation for his services. In that case the will charged the estate "with the payment of such reasonable compensation to the said Oscar F. McKenney and Frederick S. Smith as they may deem just and proper according to the time and attention they may severally devote to the affairs" of the estate. This court held that that provision would naturally be construed by any court of chancery as authorizing them to receive only such compensation for their services as trustees as the law would allow or as the court would determine to be reasonable. In the case at bar the compensation of the trustees cannot, under any circumstances, exceed six per cent of the gross annual income of the trust estate of $18,500. Granting that the principal could be so invested that it would produce a gross annual

income of six per cent it would amount to but $1100, and the compensation of both for services as trustees could not exceed $66.60. Coleman does not profit by the will at all. He is not a devisee or legatee, and as executor and trustee he simply fulfills the duty which the testatrix imposed and had a right to impose upon him, assuming that she had a right to make a will at all and that the will is valid. In *Compher* v. *Browning, supra,* the court said: "The facts that a confidential agent of a testator or a testatrix has drawn a will or procured it to be drawn and has been made executor and trustee thereunder may be suspicious circumstances which call for additional scrutiny as to the fairness of the transaction; but these facts, alone, do not invalidate the will where all the other circumstances developed by the evidence show that there was no fraud or imposition or attempt to exercise undue influence." It was held that the proponents having made *prima facie* proof of the validity of the will, the burden was upon the contestant to substantiate the charge that the will of testatrix was the result of undue influence exercised by McKenney, by a preponderance of the evidence. In other words, it was held that the fact that the one who procured the will to be written was named executor and trustee under the will did not raise the presumption of undue influence and did not place on the executor and trustee the burden of producing evidence to show that the will was the free and voluntary act of the testatrix. In *Daugherty* v. *State Savings, Loan and Trust Co.* 292 Ill. 147, it was held that the presumption of undue influence did not arise where the scrivener was a stockholder and officer of the banking institution made executor and trustee under the will and was also an officer of a charitable institution which was a substantial beneficiary under the will.

*Gum* v. *Reep,* 275 Ill. 503, on which appellees rely, is not in conflict with the rule above announced. In that case the scrivener was the son and also the attorney and confidential business agent of the testatrix. He received a sub-

stantial benefit under the will as a legatee. The share of the estate that he would have received under the Statute of Descent had his mother died intestate was increased because of certain advancements which the will charged against a brother and two sisters. There the testatrix died testate as to all her estate, and so none of her heirs received anything under the Statute of Descent. Whatever her son, the scrivener, received, he received as a legatee under her will, and so he was brought clearly within the rule established in *Weston* v. *Teufel, supra,* and other cases following it.

It was error to give instruction No. 34. The evidence produced on the trial showed there was no fraud or imposition or attempt to exercise undue influence by Coleman, and that issue should not have been submitted to the jury.

On the question of mental capacity of the testatrix forty-nine witnesses, who had known testatrix during her lifetime, testified to their knowledge of facts and circumstances bearing on her mental condition and expressed opinions with respect to the soundness of her mind. Thirty-five of these witnesses expressed the opinion that she was sound mentally. About half of them had known her for twenty-five years and more and most of the rest of them had known her the last four or five years of her life. Most of them saw and talked with her frequently down to and including the week in which the will in contest was executed. They included farmers, bankers, contractors, merchants, real estate and insurance men, housewives, domestic servants, and her personal physicians. Fourteen witnesses testified on behalf of contestant and expressed the opinion that testatrix was mentally unsound. Four of the witnesses were relatives of those interested in setting aside the will and had known her all of their lives. The other witnesses had known her for periods ranging from a few months to sixteen years. They included an insurance man, a nurse, a milliner, a truck farmer, two plumbers, two domestic servants and two housewives. In addition to these witnesses, three physicians who

qualified as experts answered a hypothetical question based on the evidence produced by contestant and expressed the opinion that the subject described was mentally unsound.

Proponents' evidence established substantially the following: Testatrix was about sixty-six years of age, had lived in Springfield for many years, had always lived an active life, had bought, sold, rented and managed residence and business properties in Springfield, up to the time of her death managed and collected the rents from a business property owned by her and the contestant, accounted regularly and accurately to contestant for her share of the rents, kept all her properties properly insured and repaired, personally selected wallpaper for her houses and personally supervised the repairing of them, and paid by check the many accounts with persons with whom she was doing business up to the time of her death. When her husband died, in July, 1918, she selected a casket for him, she selected the flowers and directed that certain floral pieces be made, she went to the cemetery and indicated the spot on the lot where she wanted the grave dug and selected a concrete grave vault for her husband and bought a similar one to be used when she died, and she gave directions to a monument dealer to make a monument similar to one she had seen on a trip to Maryland. Shortly after her husband's funeral she went to her banker and borrowed $200 to cover the expenses of a trip to New York and Maryland to visit friends and relatives. She spent several weeks in both places, then returned alone to her home in Springfield. In the record is a picture of her and contestant and Stouffer which was taken in New York. This picture showed her to be a well-preserved woman for her age, and the surroundings shown in the picture indicate that she was enjoying a sight-seeing trip. When she returned to Springfield she talked with many of her friends and neighbors about her trip to the east and told them of meeting old acquaintances of theirs and the conversations she had with them.

In the record are seventy-seven checks, ranging in amount from fifty cents to $500, all of which were drawn by testatrix during the last year of her life. These checks total over $3000. Ten of the checks are payable to contestant. They range in amount from $42.63 to $100 and they total $611.56. The $100 check payable to contestant is dated October 2, 1918, a month before the will in contest was executed. There is no evidence that in all these business transactions she ever lost or misused a single dollar.

Dr. W. P. Armstrong testified that he had practiced his profession about twenty-eight years; that he was a graduate of an American school and also had studied abroad; that he began treating testatrix on June 14, 1918; that she was suffering from nephritis and cardiac asthma; that the last time he treated her was October 16, 1918; that when he first began treating her she was suffering from an attack of asthma and had great difficulty in breathing; that he attended her every day until she recovered from the attack; that her manner of conversation and conduct in his presence were not out of the ordinary and he discovered no evidence of mental disorders whatever; that she gave him an intelligent history of her trouble and always answered his questions promptly; that he noticed no lack of memory and did not discover that she was suffering from any delusions; that he treated her in her home and she was usually up and walking about the house, and that he did not discover that her eyesight was seriously affected and considered her a normal patient. It was his opinion that testatrix was mentally sound during all the time he treated her.

Dr. L. C. Taylor testified that he had been engaged in the general practice of medicine about twenty-eight years; that he was a graduate of the medical college of the University of New York and that he had studied four years in Vienna, Berlin and Paris; that he knew testatrix in her lifetime and attended her from October 20, 1918, to the time of her death; that when he was called he found her

suffering from a chronic form of nephritis; that she seemed to be mentally clear; that she talked with him intelligently; that he visited her on six occasions, October 20, 26 and 30, and November 10, 12 and 13; that on each occasion he spent from twenty minutes to half an hour in conversation with her, and that she answered his questions promptly and intelligently and seemed to be normal mentally, although she was in a very serious physical condition when he made his last visits.

The evidence produced by contestant established substantially the following: Testatrix had been suffering for some ten years with chronic nephritis and during the last year or more of her life was in a nervous and emaciated condition. She was forgetful and untidy and suffered from delusions. Two plumbers testified that they had been called to the house several times to fix leaks in the plumbing and that they were unable to find any leaks. A house-man testified that she would order him to do a particular job and before he could finish it she would order him to do another and then send him back to do the first job. Other witnesses testified that she would misplace things about the house and then accuse her servants or neighbors of stealing them, and that she would forget things she was cooking on the stove and let them burn. A nurse testified that she refused to take some medicine one time because she thought they were trying to poison her. Four witnesses,—the son and the daughter-in-law of contestant, a cousin of contestant and a half-sister of contestant's nephew, Park Johnson,—testified that testatrix had told them that contestant was an immoral woman and that she kept a house of ill-fame in Springfield. One of these witnesses said that testatrix had always been peculiar and that she had been insane for eight years and should have had a conservator during all that period. Dr. Wood testified that testatrix was totally blind during the entire summer and fall of 1918 and that she could not get around without someone to help her.

No useful purpose can be served by setting out the substance of the testimony of each witness separately. We have read all of the evidence in the record and are impressed with the injustice of the jury's verdict. The clear preponderance of the evidence is in favor of the mental competency of testatrix. The witnesses for proponents had an equal, if not a better, chance to form a correct opinion of the mental condition of the testatrix, and they outnumbered contestant's witnesses more than two to one. Of the forty-nine witnesses who testified, only four said that they heard testatrix speak disparagingly of the character of her sister Georgia. Two or three of them had heard her complain of contestant's ill-treatment of her and had heard her say that contestant was doing wrong in permitting some people of ill-repute to room in her house. There seems to have been some basis for at least part of this complaint, because Dr. Wood, in a letter written to testatrix October 26, 1918, said, "I am very sorry the way ma is acting, but I guess she will never be different;" and in a letter written November 5 he said, "It makes me feel very bad that you and ma are not friendly at this time; she does not write to me and I don't know what she is doing, but I hope that something will happen that will bring you and her together again." Testatrix had talked with many of her friends regarding the disposition of her property, and her plan always seemed to be to make provision for her nephews and those of her deceased husband. She seemed to realize her obligation to his relatives because she had received about one-third of her property through him. In no conversation did she ever say that she was going to give her property to her sisters. That she wrote to her nephew, the son of contestant, regarding what she proposed to do with her property is indicated by a paragraph in his letter to her of October 26, less than two weeks before the will in contest was executed. He said: "If it should be God's will that you should be taken away in the future, I would prefer to leave the choice to you if

you should care to remember me, as I know you would choose that which would benefit me most in the future." There is nothing unfair or inequitable in the distribution of the estate of testatrix. Her sisters were advanced in years and the record shows that contestant had means of her own. In addition to giving to contestant's son a life estate in a share of her estate equal to that given to the sons of her other sisters she gave him a life estate in her home.

We are convinced from a careful consideration of the whole record, after giving the testimony of the witnesses for appellees full credit to which it is entitled, that the verdict of the jury is palpably against the weight of the evidence and that the court erred in not setting it aside and granting a new trial. It is incumbent on the contestant to prove by a preponderance of the evidence that testatrix did not have sufficient mental capacity to make a valid will at the time she executed the writing produced. The question is, Did she, at the time of executing the instrument purporting to be her will, have sufficient mind and memory to enable her to understand the particular business in which she was then engaged? If she was able to remember who were the natural objects of her bounty, recall to mind her property and make disposition of it understandingly according to some purpose or plan formed in her mind, she was possessed of testamentary capacity. As we view the record, it becomes our duty to remand the cause for a new trial. *Bradley* v. *Palmer,* 193 Ill. 15; *Austin* v. *Austin,* 260 id. 299; *McGovern* v. *McGovern,* 282 id. 97.

The decree is reversed and the cause is remanded to the circuit court of Sangamon county.

*Reversed and remanded.*