RICHARD SNELL, Appellee, vs. LINCOLN H. WELDON, Exr.,
                    Appellant.

*Opinion filed February 19, 1909—Rehearing denied April 17, 1909.*

1. WILLS—*when question of undue influence should be taken
from the jury.* Where there is no evidence to support a charge
of undue influence that question should be taken from the jury by
the court.

2. SAME—*undue influence must be directly connected with exe-
cution of will.* Undue influence, to avoid a will, must be directly
connected with the execution of the instrument and be operating
when the will is made; it must be influence specially directed to-
ward procuring the will in favor of particular parties, and be such
as to destroy the freedom of the testator's will and render the in-
strument obviously more the offspring of the will of others than
of his own.

3. SAME—*when evidence does not support charge of undue in-
fluence.* The issue of undue influence should be taken from the
jury where the evidence shows, beyond controversy, that the en-
tire scheme of the will originated with the testator, and there is no
evidence to show that the legatee, who is claimed to have exercised
such influence and who was given a comparatively trifling amount
by the will, had ever spoken or written to the testator about the
will, nor that she, or any other person interested in the will, was
present when the will was prepared or executed, nor that any per-
son ever suggested the making of such will.

4. SAME—*existence of improper relations with legatee does not
establish undue influence.* The existence of improper relations be-
tween the testator and a legatee is no ground for setting aside a
will, and does not, of itself, establish undue influence, although, if
there is proof that such legatee has exercised influence, the exist-
ence of the unlawful relations may be considered for the purpose
of determining whether the influence was undue, but not otherwise.

5. SAME—*when letters to the testator are incompetent.* Letters
to the testator, found in his trunk after his death and indicating
meretricious relations with the writer, are not evidence that such
relations existed; nor are they competent to prove the mental con-
dition of the testator unless there is proof of some act by him with
reference to them which the contents of the letters are admissible
to explain.

6. SAME—*when endorsement on letter does not show either in-
sanity or undue influence.* An endorsement, in the testator's hand-
writing, on an obscene letter to him, of the words, "The best letter

of all, sure," tends only to show moral delinquency, and not insanity or undue influence.

7. SAME—*immoral conduct by testator is not ground for setting aside his will.* Where a testator is of sound mind and memory, the fact that his conduct and sentiments are immoral is not ground for setting aside the will.

8. SAME—*injustice and prejudice must amount to insane delusion to render will invalid.* Unless the testator's conduct exhibiting prejudice, unreasonable anger, injustice or unfairness amounts to an insane delusion, it is not, of itself, ground for setting aside the will.

9. SAME—*opinions of non-expert witnesses as to soundness of mind do not determine the fact.* In a will case, where unsoundness of mind is claimed, a non-expert witness, after stating facts and circumstances from which the jury may form an opinion, may state the impression which such facts and circumstances make upon his mind; but his opinion is to be taken by the jury only for what it is worth, according to the intelligence of the witness and his capacity to form the opinion, and great latitude should be allowed on cross-examination.

10. SAME—*evidence tending merely to blacken the reputation of deceased is inadmissible.* Evidence which has no purpose or effect except to exhibit the moral delinquencies of the testator and blacken his reputation, and having no relevancy to any issue in the case, is not admissible.

11. SAME—*when abstract instruction should not be given.* An instruction, abstract in form, stating that the capacity to comprehend a few simple details, if the estate be small, may qualify a person to intelligently dispose of the property, while if the estate be large the same mental capacity might be insufficient, should not be given, where there is no reasonable question of the testator's ability to understand the details of his large estate, which he managed up to his death. (*Dillman* v. *McDanel,* 222 Ill. 276, distinguished.)

12. PARTIES—*when a new-born child should be made a party.* Where a child born to one of the heirs-at-law after a suit to set aside a will is begun is the only living person who will be entitled to the estate if it is alive at the termination of the trust created by the will, it is not represented by the adverse interests of the heirs-at-law who are seeking to set aside the will, and it should be made a party and represented.

APPEAL from the Circuit Court of DeWitt county; the Hon. SOLON PHILBRICK, Judge, presiding.

HERRICK & HERRICK, and BARRY & MORRISSEY, for appellant:

The evidence on the part of the proponent shows that the testator had a higher degree of mentality than the law requires. The test is whether the testator had sufficient mind and memory to understand the business in which he was engaged while making the will, and is not whether he had sufficient mental capacity to comprehend and transact ordinary business or act rationally in the ordinary affairs of life. *Johnson* v. *Farrell,* 215 Ill. 542.

An insane delusion is a belief in something, without evidence, which does not exist and which no rational person would believe, and which refuses to yield to evidence or reason. *Scott* v. *Scott,* 212 Ill. 597; *Owen* v. *Crumbaugh,* 228 id. 380; *Middleditch* v. *Williams,* 45 N. J. Eq. 726.

It is not an insane delusion unless it is purely a creation of the imagination. *Appeal of Murdock,* 185 Pa. St. 203.

In order to make out an insane delusion the testator must believe that the things stated by him are true. *In re Scott's Estate,* 60 Pac. Rep. 527; *Society* v. *Hopper,* 33 N. Y. 619.

The fact that a man may become prejudiced against some of his children without sufficient cause, and may make unjust remarks against them not warranted by the facts, does not show that he has insane delusions or is devoid of testamentary capacity. *Schneider* v. *Manning,* 121 Ill. 376.

The burden is on contestant to prove that which he affirms. The task is not performed by establishing a delusion, for a testator may have both the delusion and testamentary capacity, but he must go further and prove that the delusion controlled or in some manner affected the execution of the will before the evidence is sufficient. *Wait* v. *Westfall,* 68 N. E. Rep. 271.

Where there is no evidence that anyone said or did anything at the time of the execution of the will in any way calculated to influence the testator to make any of the de-

vises or bequests therein mentioned or to neglect to make other provisions, the question of undue influence should be taken from the jury. *Woodman* v. *Bank,* 211 Ill. 578; *Wickes* v. *Walden,* 228 id. 56.

The influence which will avoid a will must be specially directed toward the object of procuring a will in favor of particular parties. *Woodman* v. *Bank,* 211 Ill. 578.

Undue influence, to avoid a will, must be directly connected with the execution of the instrument and operating when it is made. *Wickes* v. *Walden,* 228 Ill. 56.

Correspondence found among the testator's papers after his death is not competent to prove his sanity or insanity, unless connected, by evidence, with some act of his with reference to them and which the contents of the letters are admissible to explain. 1 Underhill on Wills, 149; 16 Am. & Eng. Ency. of Law, 610.

Such letters are not admissible as proof of the facts therein stated. *Capen* v. *Glass Co.* 105 Ill. 185; *Razor* v. *Razor,* 149 id. 621.

They are not competent on the question of undue influence, because the admissions or declarations of a person tending to prove that he exercised undue influence on the testator are not admissible. *McMillan* v. *McDill,* 110 Ill. 47; *Campbell* v. *Campbell,* 138 id. 612.

The issue is not whether the testator's conduct was in accordance with good morals. Satyriasis and moral delinquency are not sufficient to set aside a man's will if he is capable of understanding and transacting ordinary business. *Wickes* v. *Walden,* 228 Ill. 56.

Mental or moral depravity is not insanity. *Goodwin* v. *State,* 96 Ind. 550; *Hill* v. *Hill,* 27 N. J. Eq. 214.

INGHAM & INGHAM, LEMON & LEMON, JOHN FULLER, and EDWARD J. SWEENEY, for appellee:

In a proceeding to set aside a will the verdict of a jury will not be set aside when the evidence of the successful

party, when considered by itself, is sufficient to sustain the
finding; and this notwithstanding it may appear to be
against the strength and weight of the evidence. *Shevalier
v. Seager,* 121 Ill. 564; *Petefish v. Becker,* 176 id. 448;
*Moyer v. Swygart,* 125 id. 262.

If it appears that some improper testimony has been ad-
mitted or improper rulings made, still if the legitimate evi-
dence in the case sustains the verdict and it is apparent that
upon another trial the result would necessarily be the same,
a judgment or decree will not be reversed. *Carpenter* v.
*Davis,* 71 Ill. 395; *McConnel v. Kibbe,* 33 id. 175; *Shev-
alier v. Seager,* 121 id. 566; *Potter v. Potter,* 41 id. 80;
*Graff v. People,* 208 id. 326; *Pahlman v. King,* 49 id. 266;
*Hardy v. Keeler,* 56 id. 152.

This court has repeatedly held "that there may be insan-
ity without the general business capacity of the individual
being affected thereby." *Bible Society v. Price,* 115 Ill.
637; *Kaenders v. Montague,* 180 id. 305; *Searle v. Gal-
braith,* 73 id. 272.

The unreasonableness of the testamentary disposition of
property may be considered as a circumstance tending to
show unsoundness of mind or undue influence, in connec-
tion with all the other facts. *Kaenders v. Montague,* 180
Ill. 305; *England v. Fawbush,* 204 id. 384; *Dillman* v.
*McDanel,* 222 id. 276; *Piper v. Andricks,* 209 id. 564;
*McCommon v. McCommon,* 151 id. 428.

What the testimony tends to prove is a question of
law; what it does prove is a question of fact for the jury.
It is not error to instruct the jury as to what the testimony
tends to prove. It is not an invasion of the province of
the jury. Any expressions found in opinions of courts to
the contrary are mere dictum. *Smith v. State,* 41 N. E.
Rep. 595; *Floto v. Floto,* 233 Ill. 605; *Graham v. Nowlin,*
54 Ind. 389; *People v. Flannelly,* 128 Cal. 83; *People
v. Casey,* 231 Ill. 269; Hughes on Instructions to Juries,
sec. 173.

This court in a recent case where unsoundness of mind and undue influence was charged, and where letters written to the testatrix by two of the beneficiaries under the will who were charged with exerting undue influence were given in evidence on proof of their genuineness being made, used the following language: "The letters referred to were written to the testatrix by two of the parties who were charged with having unduly influenced her to execute the will. Said letters were competent and relevant testimony in behalf of the appellants upon this issue, but could not be received in evidence until their genuineness had been first proved." *Garrus* v. *Davis,* 234 Ill. 331.

Mere declarations of the testator are inadmissible in evidence as tending to show the truth of the assertion so made, but they are admissible alone for the purpose of proving his mental condition. *Reynolds* v. *Adams,* 90 Ill. 134; *England* v. *Fawbush,* 204 id. 384; *Comstock* v. *Hadlyme Society,* 28 Am. Dec. 105.

Where a person is laboring under insane delusion or monomania, or where his insanity, whether described as any type or name that may be applied to it, is in respect of the natural objects of his bounty, he cannot know and understand the business in which he is engaged when making his will, nor can he know in a legal sense, or appreciate in a rational sense, the relation of those who are the natural objects of his bounty. If he is insane upon the subject of his relation and obligations to his family, or any other subject relating to the testamentary disposition and distribution of his property, he is insane in every testamentary sense. Page on Wills, 128, 129; *Bible Society* v. *Price,* 115 Ill. 637; *Petefish* v. *Becker,* 176 id. 448; *Dowie* v. *Sutton,* 227 id. 183.

The appellee was a competent witness to testify to the finding of the letters offered and introduced in evidence. *Rogers* v. *Tyley,* 144 Ill. 652; 2 Starr & Cur. Stat. 1831.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

Thomas Snell was born in December, 1818, and was a resident of this State for over fifty years. Having accumulated an estate of more than $1,000,000, he determined in September, 1901, when eighty-two years old, to make a will, and applied for that purpose to Judge Lawrence Weldon, of Bloomington, who had been his legal adviser for many years. Judge Weldon was then a judge of the court of claims at Washington, and referred Mr. Snell to his former law partner, Judge R. M. Benjamin. Mr. Snell stated to Judge Benjamin that he had property in Iowa, Missouri, and McLean and DeWitt counties, in this State, and that his estate would be over $1,000,000; that he had seen property in his own town squandered and he did not propose his should be during the lifetime of his heirs; that he wanted to put the property in the hands of a trustee and provide for the management of it; that he had all the details in his own mind and knew how he wanted his will made and did not care about any suggestion but wanted the attorney to put it in legal form, and that the attorney should take his time and put the details in writing and send it down to him at Clinton. He brought with him to the attorney memoranda of descriptions of his land, and said that he was not going to sign the first draft as there would be other things; that the attorney need only prepare a draft and he would consider it, and that he wanted to see it in typewriting. Judge Benjamin prepared a first draft of the will and submitted it to Mr. Snell, who, after consideration, came back two or three weeks later and gave other provisions and details as to the management of his estate to be incorporated in the will. A second draft was then prepared and sent to Mr. Snell and a few weeks later he came back with it and a third draft was prepared, which finally met his views. About the time that he went to Judge Benjamin he

wrote, on September 10, 1901, to the appellant, Lincoln H. Weldon, a letter, in which he stated that he had about made up his mind how he would fix his property; that he wanted Weldon for trustee if he would serve him; that he would not be required to give bond, and that the estate would amount to over $1,000,000 and there would be considerable work to learn his affairs. The will as completed was mailed to Mr. Snell at Clinton about December 1, 1901, and on December 10, 1901, he called upon three business men who had known him for a great many years, one of whom had been his physician, and told them he was making his will and wanted them to witness it, and it was then signed and attested in due form. The will contained thirty-three paragraphs, and was of such length that it is not practicable to here state all its provisions; but as the entire scheme of the will originated with Mr. Snell and the provisions were devised by him and were only put into form by Judge Benjamin, it is thought best to state its provisions in a general way.

By the will the testator devised all his property to the appellant, as trustee, and named him as executor. It provided for the payment of funeral expenses and just debts, and for building a family vault or tomb for not less than $7000 nor more than $10,000. It then provided for the payment, annually, during their lives, of the following sums to the parties named: To Hannah A. Snell, widow of a deceased son, $1000; to Joseph Snell, brother of the testator, $400; to Clara Belle DeLand, $400; to Mabelle Snell, daughter of the testator's nephew, Thomas Snell, $400; and to his son, Richard Snell, the appellee, $1000. The will then provided for the payment, annually, of $1000 to each of the testator's three grandchildren, Lena E. Dinsmore, Thomas Thornton Snell and Harry C. Snell, until improvements in East Ft. Dodge, Iowa, to the amount of $150,000, should be made and paid for. After such improvements were made, $3000 was to be paid annually to

each of said grandchildren, with a reduction in case of destruction of any business house by fire. The trustee was next directed to pay promptly all taxes and assessments, to keep all business houses reasonably insured, to keep all real property, except vacant lots, well rented for not more than terms specified in the will. The next provision was for making improvements on the Ft. Dodge property to the amount of $150,000 from rents and profits and proceeds of sale, and further improvements, with the consent of the grandchildren, to the amount of $100,000, if it could be done without delaying regular payment of the legacies. To raise money for improvements or other purposes of the trust the trustee was authorized to sell promissory notes at their face value or present worth or put them up as collateral security, and he was authorized to raise by mortgage, with the written consent of at least one of the grandchildren, money for improvements, not exceeding $50,000 at any one time, for not more than five years. The will then empowered the trustee to sell and convey lots in six different places, and lands in Putnam county, Missouri; Sioux, Hancock and Boone counties, Iowa, and other specified property, upon terms as to cash and mortgage security fixed by the will. The trustee was authorized, with the written consent of at least one of the grandchildren, to plat lands, and any surplus accumulated was to be invested in lands in DeWitt or McLean county, in this State, or Webster and Hamilton counties, in Iowa. The will then provided for the sale of land, and re-investment, with the consent of the grandchildren and the approval of the circuit court of DeWitt county. There were extensive directions and details as to the management of the trust estate and the appointment of a successor in trust in case of vacancy. After five years the trustee was to pay to each of said three grandchildren, for life, one-third of the net income from the rents and profits, after payment of the annuities, taxes, assessments and other charges against the property, and in case of the

death of any of the grandchildren before final distribution
of the estate, his or her annuity was to be paid to his or her
heirs of the testator's blood.  If his son, the appellee, Rich-
ard Snell, should leave any heirs of his body, the trustee
was to pay to such heirs one-fourth of the net income, and
the shares of the other grandchildren were to be reduced
accordingly to one-fourth.  Upon the decease of his son
and all of the grandchildren and great-grandchildren of the
testator living at his decease, the trust was to come to an
end and the trust property vest absolutely among the tes-
tator's descendants then living, in equal parts, whatever
their respective degrees of relationship, and they were to
take *per capita* and not *per stirpes*.  The appellant was ap-
pointed trustee and executor without bond and required to
make annual reports.  This summary does not contain a
reference to all the provisions of the will but is sufficient
for the present purpose.

Afterward, on November 28, 1904, the testator exe-
cuted the first codicil to his will, and it was witnessed by
officers of the bank where he did business, and at his re-
quest.  This codicil revoked the annuity of $400 to Clara
Belle DeLand and divided that amount between the testa-
tor's brother, Joseph Snell, and Mabelle Snell, who were
each given $600 a year.  It revoked the provision that if
the son, Richard Snell, should leave any heirs of his body
the trustee should pay one-fourth of the net income to
them, reduced the annuity of $1000 per year to Richard to
$50, and gave $3000 to each of the eight children of said
Joseph Snell.  A second codicil was executed November 29,
1905, at Bloomington, and was witnessed by two attorneys
in the office where it was prepared.  It gave one-half sec-
tion of land in DeWitt county to the granddaughter, Lena
E. Dinsmore; to Thomas Thornton Snell, one of the grand-
sons, it gave one hundred and seventy-five shares of the
capital stock of the St. Joe Valley Bank, at Elkhart, Indi-
ana, and the note of the legatee for $6000 held by the tes-

tator. It gave to the other grandson, Harry C. Snell, four hundred acres of land in DeWitt county, two hundred shares of capital stock of said bank and a note of the legatee for $1500. It released the balance due on a claim against the estate of the father of the three grandchildren; set apart $1500 to take care of the cemetery lot; modified some other clauses and defined more clearly the directions to the trustee, making clear the time for the final distribution. A third codicil was executed October 9, 1906, in the same attorney's office, in Bloomington, and the only change made by it was an increase of the annuity to Mabelle Snell to $1200 a year.

The testator died on June 19, 1907, and left as his heirs-at-law his son, Richard Snell, the appellee, and Thomas Thornton Snell, Harry C. Snell and Lena E. Dinsmore, children of his deceased son, James Thornton Snell. The will was admitted to probate on July 26, 1907, by the county court of DeWitt county, and appellant was appointed executor. The appellee, Richard Snell, filed his bill in this case in the circuit court of DeWitt county to set aside the will and each of the codicils, charging that his father, the testator, was not of sound mind and memory but was laboring under insane delusions which estranged him from appellee, and was induced to execute the instruments by undue influence exercised by Mabelle Snell and a certain other person known as Belle, whose full name was unknown. A guardian *ad litem* was appointed for three minor children of Lena E. Dinsmore. Mabelle Snell was married after the suit was commenced, and answered as Mabelle Snell McNamara. Issues were made up as to the validity of the will and codicils and there were two trials. At the first trial there was a disagreement, but at the second the jury returned a verdict. The first question submitted to the jury was whether the testator was of sound mind and memory at the time of signing the original will. The jury answered, "No." A like question and answer was submitted and re-

239—19

turned as to each one of the codicils. The fifth question was whether the testator was laboring under an insane delusion regarding the appellee when he signed the will or any codicil. The answer was "Yes," and the jury being required to specify which papers were so executed, named the first, second and third codicils but omitted the original will, which was equivalent to a finding that there was no insane delusion respecting the appellee when the will was made. In answer to another question whether the will or codicils were signed by reason of undue influence of any devisee, the jury answered, "Yes," and being required to specify which of the papers were so made, named the first and third codicils, omitting the original will and the second codicil. The court entered a decree setting aside the will and each codicil and adjudging the costs against the appellant, as executor, to be paid in due course of administration.

At the close of the evidence appellant moved the court to instruct the jury that there was no evidence of undue influence and they should not consider that question in making up their verdict. The court refused to give the instruction tendered and appellant excepted. Where there is no evidence to support a charge of undue influence that question should be taken from the jury by the court, (*Woodman* v. *Illinois Trust and Savings Bank,* 211 Ill. 578,) and the undue influence which will avoid a will must be directly connected with the execution of the instrument and be operating when the will is made. (*Wickes* v. *Walden,* 228 Ill. 56.) It must be influence specially directed toward procuring the will in favor of particular parties, and be such as to destroy the freedom of the testator's will and render the instrument obviously more the offspring of the will of others than of his own. (*Roe* v. *Taylor,* 45 Ill. 485; *Woodman* v. *Illinois Trust and Savings Bank, supra.*) The circumstances of the execution of the will and each codicil, as above detailed, were proved and not controverted. The evidence showed, beyond controversy, that the entire scheme

originated with the testator himself and was carried out according to his direction, and there was not a word of evidence tending to show that any influence whatever was exercised by Mabelle Snell, or any other person, to induce the making of the original will or any codicil. The person mentioned in the bill as Belle was not made known at the trial, and the only claim of undue influence was on the part of Mabelle Snell; but, so far as the evidence shows, she was never nearer than Kansas City, where she lived when the will and codicils were executed, and there was absolutely no evidence that she ever said or wrote one word to the testator about his will. There was no evidence that any other person in the slightest degree interested in making the will or any codicil was present at the time when either was written by the attorneys or executed by the testator, or that any person at any time or place suggested the making of the same. Considering the amount of the estate the annuity to Mabelle Snell was trifling in amount, being no more than to afford her a comfortable support, and there is nothing in the will, or outside of it, to justify the finding that two of the codicils were the product of influence. The court erred in refusing to give the instruction.

Although there was no evidence of undue influence, the verdict of the jury as to the two codicils was undoubtedly based upon evidence improperly admitted. After the death of the testator the appellee took from the testator's trunk letters from Mabelle Snell which the court admitted in evidence. The language used in these letters was filthy beyond comparison and they contained the coarsest and most obscene words known to the vocabulary. They indicated the existence of meretricious relations between the writer and the testator, and the jury would naturally infer from their contents the existence of such relations. It scarcely need be said that the letters were no evidence of such relations or of the existence of any fact, and if they had been, they would still have been incompetent. The existence of im-

proper relations with a legatee would be no reason what-
ever for setting aside the will, and would not, of them-
selves, establish undue influence. (*Smith* v. *Henline,* 174
Ill. 184.) The silence of the testator and retaining the let-
ters in his trunk did not necessarily imply assent to what
they contained. (*Razor* v. *Razor,* 149 Ill. 621.) When
there is proof that influence has been exercised by some per-
son upon a testator, the existence of unlawful relations with
that person may be considered for the purpose of determin-
ing whether the influence was effective or undue, but not
otherwise. (*Smith* v. *Henline, supra.*) The letters were
not competent on the question of mental capacity to make
a will. Letters to a testator are not competent to prove his
mental condition unless there is proof of some act by him
with reference to them, which the contents of the letters are
admissible to explain. (16 Am. & Eng. Ency. of Law,—
2d ed.—610; 1 Underhill on Wills, 194.) The testator had
written on one of the letters, "The best letter of all, sure;"
but as to that letter, the fact that he had made the mem-
orandum only tended to show moral delinquency, and had
no tendency to show either insanity or undue influence.
Where a testator is of sound mind and memory, the fact
that his conduct and sentiments are not in accordance with
good morals is no ground for setting aside his will. *Wickes*
v. *Walden, supra.*

On the question of mental capacity to make a will, it ap-
peared that the testator was a man of remarkable business
ability, who had accumulated a great estate by his own ef-
forts and management. He had been a railroad contractor
for a portion of the Illinois Central railroad and the Lake
Erie and Western, and was colonel of the 107th Illinois In-
fantry in the civil war. He was one of the founders of a
bank in Clinton, and had large landed interests in DeWitt
and McLean counties, in this State, and in Iowa, and had
some land in Missouri. At the time of his death he owned
six thousand acres of land in Iowa and about five thousand

acres in Illinois, as well as city and town property. The
rentals of his Illinois lands amounted to from $35,000 to
$40,000 a year. It was also proved that the testator man-
aged his vast estate up to the time of his death. He neces-
sarily had agents, but he gave them directions, and a large
number of business letters in the record show that he had
good business ability and a clear understanding of his affairs
to the very last. As his property consisted of farms, town
lots, city property, bank stock and the like, it was of such
a nature as required good business ability for its manage-
ment. After the will was made he purchased a controlling
interest in a bank at Emporia, Kansas, in which he invested
more than $100,000, and in 1904 sold out at a profit of
$30,000. In that year he bought a controlling interest in
the St. Joe Valley Bank and consolidated it with another in
which he had an interest, and was director and president
of that bank at Elkhart, Indiana, until his death. He had
a bank account and always knew its condition, and when
the account was balanced he knew if there were any checks
that had not come in. In 1906 a suburban railway company
negotiated for right of way through his property north of
Clinton for two miles. In the negotiations he insisted upon
stipulations for culverts, the kind of fence to be in front
of the residence, the maintenance of a platform for passen-
gers on the property, and various other provisions show-
ing that he was perfectly competent to protect himself, and
these conditions were put in the deed. His agents collected
the rents and made reports, which the testator examined
with intelligence, and the instructions given to the agents
show not only that his mind was perfectly clear, but that
he understood his affairs as well as any man having an es-
tate of the same size. There was no evidence of any im-
portance to the contrary, and the evidence for the appellee
on that subject was confined to a few minor matters, such
as that the testator supposed he had lost a couple of notes

from a bundle and thought that a man who got some old furniture had got some of his papers.

Unless the testator's conduct proved the existence of an insane delusion it would be no reason for setting aside the will. Injustice, unfairness, prejudice or anger, without a reasonable cause, does not disqualify any person from making a valid will. Since the cause is to be remanded for a new trial we express no opinion as to the weight of the evidence on the question of the existence in the testator's mind of an insane delusion with reference to his son.

It is not feasible to review all the rulings on the admission of evidence in the lengthy trial, but the general nature and course of the rulings may be pointed out. When the case of *Roe* v. *Taylor, supra,* was decided, it was said that there was much conflict on the question whether witnesses not experts could give an opinion of the soundness of mind of the testator, but it was then held, and the rule has since been followed, that a witness who has detailed the facts on which an opinion is based may give his opinion, to be valued by the jury according to the intelligence of the witness and his capacity to form the opinion, and that great latitude should be allowed on cross-examination. A witness may state facts and circumstances from which the jury would form an opinion, and the law then permits him to give the impression which such facts and circumstances made on his mind, to be taken by the jury for what it is worth. This case seems to have been tried on the theory that the opinions of witnesses were to determine the fact, and the witnesses for the appellee based their opinion that the testator was not of sound mind either on his language and conduct toward the appellee or his talk about women, and the cross-examination was unduly restricted. One witness who testified that he was not of sound mind and memory from 1900 until his death, was asked, on cross-examination, if he wished to be understood as saying that the testator was not competent to transact the ordinary business affairs of life

knowingly and understandingly since the year 1900, and the court sustained an objection to the question. A witness who was a lawyer was asked, on cross-examination, if he did not sue the testator several times during the period to which his opinion related and never had any guardian appointed for him or suggested to the court that he was of unsound mind, and the court sustained an objection. When a witness based an opinion on the fact that the testator said that he had made gifts to Mabelle Snell, the witness was prohibited from giving to the jury the reasons stated by the testator for making the gifts, which would tend to show whether they were the acts of a rational or insane man. A witness for the appellant who testified that the testator was of sound mind and memory, and who was a witness to the will, was asked, on cross-examination, if he had changed his opinion as to the mental condition of the testator, and after informing the court that it was not based on his own knowledge but only on things that he had heard and that came to him on the last trial, he was compelled to answer that he judged it was an impaired mental condition. The answer was afterward excluded, but it put before the jury an opinion based on the letters and other things that the witness had heard, and the error was not cured. On the part of appellee a witness was called who had treated the testator for indigestion in 1899, two years before the will was made, and he was permitted to give to the jury what the testator said; that he had been to Chicago on a little "jamboree;" that he had visited a house of ill-repute and what occurred there, and that he had eaten too much. The witness testified that he was called again, and the testator said he had been eating lobsters and over-eating, and made a like statement as to a trip to Chicago and also a trip to Chattanooga, and that his trips to Chicago cost him sometimes between $500 and $600. The only purpose or effect of this evidence was to exhibit the frailties and moral delinquencies of the testator. What he

said was no evidence of any fact and it was not competent or relevant to any issue in the case. If he was dissolute or profligate and his conduct disgraceful and reprehensible it would not affect his ability to make a will, and evidence which tends only to blacken the reputation of a testator is not admissible. (*Graham* v. *Deuterman,* 217 Ill. 235.) These illustrations indicate the general character of the rulings during the trial, and they were both erroneous and prejudicial.

The third instruction was abstract in form, and told the jury that the capacity to comprehend a few simple details, if the estate be small, might qualify a person to intelligently dispose of his property, while if the estate be large the same mental capacity might be wholly insufficient. That instruction was given in *Dillman* v. *McDanel,* 222 Ill. 276, and was not regarded as misleading in that case. In this case there is no reasonable question of the ability of the testator to understand the details of his large estate which he managed up to his death, and while the instruction may be correct as a conclusion of fact, it should not have been given in this case.

The jury being required to answer whether the testator was laboring under an insane delusion regarding the appellee when he signed the will or any codicil, answered that he was, and specified each of the codicils, so that their conclusion was that there was no insane delusion respecting the appellee when the will was made. They answered another question that he was not of sound mind and memory at the time of signing the original will, and that conclusion could only have been based upon general mental incapacity to make a will, of which there was no evidence whatever. As we have already shown, there was no evidence upon which to base the finding that the first and third codicils were the product of undue influence. The verdict was against the evidence and the court erred in not granting a new trial.

The appellant attempted to prove that after the commencement of the suit a child was born to the grandson, Harry C. Snell, but was not permitted to do so. If a child was born it is the only living person who will be entitled to the estate at the end of the trust if it should survive that period, having been born after the death of the testator. It is not represented by the adverse interest of heirs-at-law seeking to set aside the will, and it should have been made a party and represented.

The decree is reversed and the cause remanded.

*Reversed and remanded.*