ALBERT E. BOWLES *et al.* Appellants, *vs.* ELLA F. BRYAN *et al.* Appellees.

*Opinion filed April 18, 1912.*

1. WILLS—*undue influence must be directly connected with the execution of instrument.* The undue influence which will avoid a will must be directly connected with the execution of the instrument and be operating when the will was made, and it must be such as to destroy the freedom of the testator's will.

2. SAME—*what must be shown where there is no direct proof of undue influence.* Direct evidence of undue influence in procuring the execution of a will is not required, but in the absence of such proof there must be evidence of facts from which the inference of the existence of undue influence may be naturally and reasonably drawn.

3. SAME—*when question of undue influence need not be submitted to the jury.* The rule concerning motions to direct a verdict does not require the submission to the jury of the question of undue influence in procuring a will, where there is no evidence which, if standing alone and uncontradicted or unexplained, would justify the jury in finding that such influence was exercised.

4. SAME—*what does not tend to show undue influence.* The mere facts that the chief beneficiary of the will, who was the sister of the testatrix and her nearest relative, was present and took care of the testatrix during her last illness, which was not considered serious until shortly before her death; that the nephew and niece of the testatrix were not notified of her illness, and that the will was prepared during such illness, do not tend to show the exercise of undue influence in procuring the will.

APPEAL from the Circuit Court of Rock Island county; the Hon. WILLIAM H. GEST, Judge, presiding.

J. T. & S. R. KENWORTHY, and PEEK & DIETZ, for appellants.

McENIRY & McENIRY, and SEARLE & MARSHALL, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

Appellants filed their bill in the circuit court of Rock Island county against appellees to set aside the probate of the will of Emmer E. Bowles, deceased, alleging that at the time it was executed she was mentally incapable of making a will and that its execution was brought about by fraud and undue influence exercised over her by her sister, Ella F. Bryan, the principal beneficiary under the will, and her husband, Samuel R. Bryan. Appellees answered denying the allegations of the bill. The issue, "Is the writing produced as the will of Emmer E. Bowles the will of Emmer E. Bowles or not?" was submitted to a jury, which returned a verdict that it was her will. After overruling a motion for a new trial the court entered a decree dismissing the bill and adjudging costs against appellants, from which an appeal has been taken to this court.

The principal assignment of error argued in the briefs filed in this court challenges the correctness of the ruling of the trial court in giving to the jury appellees' twelfth instruction. This instruction took from the jury the questions

of fraud and undue influence, and to determine intelligently whether the court erred in giving that instruction to the jury it is necessary for us to examine the evidence found in the record for the purpose of ascertaining whether or not there is evidence in the record which, when standing alone and uncontradicted, fairly tends to support the allegation of appellants that the execution of the will of Emmer E. Bowles, deceased, was brought about by the wrongful influence of Ella F. Bryan and her husband.

The evidence shows that at the time of her death, on September 27, 1908, Emmer E. Bowles was residing on her farm, in Rock Island county. She was sixty-eight years of age and had never been married. Her mother was dead and her father, Madison Bowles, was living with her. He was over ninety years of age and was an invalid. Emmer E. Bowles left surviving as her heirs-at-law, her father, Madison Bowles, who died about one year later; a sister, Ella F. Bryan, one of the appellees; and the appellants, the son and daughter of a deceased brother. Two other brothers had died some years previous, leaving no descendants. A few weeks before her death a cousin, named Samuel Hunter, about sixty years of age, came from Indiana to live with her and her father and assist in doing the chores and some work about the farm. At the time of her death she owned the farm on which she lived, valued at $20,000, and personal property of the value of $30,000. The will provided for the payment of debts and funeral expenses, gave a bequest of $2000 in cash to each of appellants, and after making provision for the care and support of her father during his life, gave all the remainder of the estate to her sister, Ella F. Bryan, and named her executrix of the will. Testatrix was not a very strong woman physically but did her housework and was in good health, except a little worn out by her household duties and caring for her father. On Sunday, September 20, 1908, she was not well and sent Hunter to see Edna Cox, a neighboring young

woman, to ask her to come to testatrix's home and do, or assist in doing, the housework. She came that afternoon and remained until the death of testatrix. On Monday Emmer E. Bowles' condition was such that Hunter notified Mrs. Frank Bryan, the daughter-in-law of Ella F. Bryan, who lived with her husband, Frank Bryan, within a quarter of a mile of the Bowles home, and Mrs. Frank Bryan telephoned to Dr. J. M. O. Bruner, the family physician, and also to Ella F. Bryan and her husband, who lived at Hampton, eight or ten miles from the farm. The doctor arrived at the Bowles home about two o'clock in the afternoon and Ella F. Bryan and her husband arrived shortly thereafter. The doctor found testatrix in bed, suffering with pain in her stomach. She was vomiting and had some looseness of the bowels. He gave her some medicine to ease her pain and stop the vomiting and then went away. Ella F. Bryan remained and took charge of her sister and under the direction of the doctor administered the medicine which he prescribed. The doctor returned on Tuesday and found Miss Bowles was better, but she still had some pain and tenderness in the abdomen. He called again on Wednesday, and she appeared to be improved and expressed herself as feeling better. Thursday she was not so well but stated to the doctor she had been up-stairs that day. On Friday morning she was worse and the doctor concluded she was suffering from obstruction of the bowels, and an injection was given to remove the obstruction, but without success. Her pain was not great and her temperature was not high. She had been taking liquid nourishment since Monday. About five or six o'clock Saturday morning the doctor was called on account of trouble with her bladder and by use of the catheter gave her relief. He called again about noon of that day and used the catheter. Her physical condition had not particularly changed at that time, but the doctor talked with her about the advisability of calling in a surgeon for consultation regarding the obstruction of the bowels and

possibly to do some operating to remove it. She consented to his doing so if he thought best. The doctor called between eleven and twelve o'clock Saturday night. She was suffering considerable pain. That was the last time the doctor saw her. About four or five o'clock Sunday morning she suddenly became much worse and at eight o'clock died. Ella F. Bryan remained with her sister during the entire week and was with her when she died. Her husband, Samuel Bryan, was there the greater part of the time. Besides Mrs. Bryan and her husband, Samuel Hunter and Edna Cox were there all the time, and Frank Bryan and his wife called quite often to inquire as to her condition. Some of the neighbors called to see her at different times and were there on Friday and Saturday.

On Saturday morning, September 26, James W. Simonson, a banker with whom Emmer E. Bowles transacted her business, living at Port Byron, about five miles from the Bowles home, was notified by telephone by Samuel Bryan that Miss Bowles desired to see him. He went to the Bowles home about eleven o'clock that morning and was met at the door by Ella F. Bryan, who conducted him to the room of Miss Bowles. He talked to her about her condition, asked her how she was getting along and how long she had been sick. They conversed for ten or fifteen minutes, and he then asked her if she wanted to see him on business. She replied that she did. Mrs. Bryan then went out of the room. Miss Bowles stated to him that she wanted him to draw her will and told him what disposition she wished to make of her property. After talking the matter over Mr. Simonson said he would go to Port Byron and draw the will and return to Miss Bowles' home to have it executed about five o'clock. He asked her about having it witnessed, and she expressed a desire to have James Searle and his son, Ambrose, who were neighbors, as witnesses. Mr. Simonson told her to see them or send word to them to be there when he returned at five o'clock. Mr. Simonson

met Mr. Searle at Port Byron in the afternoon and told him Miss Bowles desired him to witness the will. At five o'clock Mr. Simonson, having drawn up the will, returned to the home of Miss Bowles. Mrs. Bryan came to the door and together they went into the sick room. Mrs. Bryan retired from the room and Mr. Simonson read the will over to Miss Bowles. She stated that it was satisfactory and just as she wanted it. Mr. Searle had arrived by that time and came into the room to witness the execution of the will. Mr. Simonson knocked on the door and Mrs. Bryan came in, got a pen, ink and a book, put a pillow behind Miss Bowles, who was sitting up in bed, and then left the room. Miss Bowles signed the will, and Mr. Searle and Mr. Simonson, at her request, signed as witnesses. Miss Bowles requested Mr. Simonson to take the will home and keep it and after her death to deliver it to Mrs. Bryan.

Samuel Hunter, a witness called on behalf of appellants, testified that Miss Bowles took sick on Sunday morning with pain and cramps in her stomach; that he called Edna Cox shortly after and she came over about one o'clock in the afternoon to do the housework; that the doctor came about eight o'clock Monday morning and gave her some medicine and left some for him to give; that some of the medicine left by the doctor on this visit was white powders, which he called "easing powders." Witness gave the medicine until Ella F. Bryan came and she then took charge of giving the medicine, but he was about the house all the time and assisted at times. Witness testified that as he remembered it the "easing powders" were given throughout the period of Miss Bowles' illness; that she suffered a good deal of pain at times but appeared to rest very well most of the time; that on Thursday and Friday she seemed to be more quiet than she was in the first part of the week and seemed to rest easier but told witness she did not feel any better. Hunter further testified he was in her room on Saturday morning before the doctor came. She seemed

weak and very stupid. She was lying in bed with her eyes closed part of the time and seemed weak and very stupid. He asked her how she felt, and she answered in a low tone that she did not feel any better. Before the doctor came they tried applying hot irons, bathing, and rubbing the pulse with whisky. Mrs. Bryan was doing that. They also gave the medicine that the doctor ordered them to give. She seemed very stupid and weak all day Saturday, did not talk very much, had red spots on her cheeks and her eyes seemed glassy. The white powder that was given the first part of the week was given on Saturday night and seemed to ease her. Hunter saw Simonson when he was there Saturday morning and saw Mrs. Bryan go into the sick room with him, but does not testify whether she remained or not. He saw Simonson when he was there in the afternoon but did not see Searle. He saw Miss Bowles several times before the doctor came Saturday evening, and she seemed to be asleep and did not notice anything. He had no conversation with her on any of his visits except to ask her how she felt. He was present on Sunday morning when she died. Mrs. Ella F. Bryan, Samuel Bryan, Frank Bryan and his wife and Edna Cox were there. Madison Bowles was brought into the room on a wheel chair a short time before she died. The witness did not think Miss Bowles recognized any of the family around the bedside Sunday morning. From his observation and knowledge of Emmer E. Bowles previous to her being taken sick, and during her sickness, especially on Saturday, his opinion was that she was of unsound mind on Saturday afternoon when she signed the will.

The foregoing is the substance of the most material parts of Hunter's testimony. His was the only evidence offered by the appellants in support of the allegation that the making and execution of the will was brought about by fraud and undue influence of Ella F. Bryan and her husband. The physical condition of testatrix, together with

the circumstances of Ella F. Bryan and her husband having been notified of Miss Bowles' illness, their coming to her house, remaining there, and Mrs. Bryan having charge of looking after and caring for her sister until her death, during which time the will was executed making Mrs. Bryan the principal beneficiary, and the further circumstance that appellants, a nephew and niece, who would have inherited an equal share of their aunt's estate with Mrs. Bryan if she had died intestate, lived about six miles from Miss Bowles' home but were not notified of her illness until after her death, it is claimed were circumstances tending to support the charge that the will was executed through the fraud and undue influence of Mrs. Bryan and her husband. Miss Bowles was, when in health, an intelligent and capable woman, and it is not now urged that the decree should be reversed because contrary to the testimony upon the subject of testatrix's mental capacity at the time she made the will. The rule is, as stated by counsel for appellants, that on a motion to direct a verdict, questions of the preponderance of the evidence or credibility of the witnesses cannot be considered. In cases where the law provides for a jury trial, it has been often said that if there is any evidence fairly tending to prove the issue, although it may be opposed by a greater weight of the testimony, the question should be submitted to the jury. Tested by this rule, did the court err in taking the question of the procurement of the will by fraud and undue influence from the jury?

Undue influence that will avoid a will must be "directly connected with the execution of the instrument and be operating when the will is made. It must be influence specially directed toward procuring the will in favor of particular parties, and be such as to destroy the freedom of the testator's will and render the instrument obviously more the offspring of the will of others than of his own." (*Snell* v. *Weldon,* 239 Ill. 279.) In *Libby, McNeill & Libby* v. *Cook,* 222 Ill. 206, this court discussed the rule at length,

reviewed the previous decisions upon the question, and defined the phrase "any evidence tending to prove" the issue, to mean evidence from which, if it stood alone, the jury could, "without acting unreasonably in the eye of the law," find that all material averments of the declaration had been proven. Under such a state of proof the case should go to the jury. That the court might be of opinion a verdict based on that testimony would have to be set aside because not supported by the weight or preponderance of the evidence would not authorize taking the case from the jury, but upon a motion to direct a verdict, if the court is of opinion a verdict based on the testimony offered to sustain the issue would have to be set aside for want of any evidence to support it, a verdict should be directed. In our judgment there was no evidence fairly tending to support the charge of fraud and undue influence, and that in the absence of any countervailing testimony the jury could not reasonably have found in favor of appellants upon the issue. There is no proof of any act or word of Mrs. Bryan and her husband, or either of them, in any way connecting them with any responsibility for the execution of the will, unless it be Mr. Bryan's notifying Mr. Simonson that Miss Bowles wanted to see him on business, and Mrs. Bryan's procuring pen and ink, when requested to do so, at the time the will was signed by the testatrix and the witnesses. Giving every legitimate inference to every proven act and word of Mrs. Bryan and her husband and to all the other facts and circumstances surrounding the relations between Mrs. Bryan and testatrix, yet the presence of the Bryans at her house during her last illness and when the will was made, and the absence of appellants during that time, would not, in our judgment, if standing uncontradicted or unexplained, have been sufficient to have justified a jury, acting reasonably, to have found the will was procured through the fraud or undue influence of appellees. These facts and circumstances would have been proper to be considered upon

that question together with other testimony, but standing alone were wholly insufficient to require its submission to the jury. Mrs. Bryan was the only sister of the testatrix, and, except the aged father, was her nearest living relative. Their relations were of that affectionate character to be expected of sisters situated as they were. There is nothing unnatural or unusual in the disposition of her property by the testatrix under the circumstances. There is no evidence that Mrs. Bryan or her husband ever spoke a word to the testatrix about her will or that they had any knowledge of its contents when it was executed. Neither Mrs. Bryan nor the testatrix was required to notify appellants that the execution of a will was contemplated and secure their presence either before or after it was done. What Mrs. Bryan did was what would be expected of a sister under the circumstances, and there is not the slightest proof that she did anything toward securing the execution of the will or that the subject of a will was ever mentioned between her and her sister. Direct or positive evidence of undue influence in procuring the execution of a will is not required, but in the absence of such proof there must be evidence of facts from which the inference of the existence of undue influence may be naturally and reasonably drawn. *Dowie* v. *Sutton, 227* Ill. 183.

Complaint is made of the court's action in giving one instruction for appellees in addition to the one taking the issue of fraud and undue influence from the jury, and also in refusing three instructions asked by appellants. If there was any verbal inaccuracy in the given instruction complained of, it was not of a character to justify a reversal of this decree. We are impressed that this decree is abundantly supported by the evidence, and that appellants were not prejudiced by the rulings of the court in giving and refusing instructions.

The decree is affirmed.                    *Decree affirmed.*