(No. 24969.—

WILLIAM H. GILBERT *et al.* Appellants, *vs.* ORA ONEALE *et al.* Appellees.

*Opinion filed April 14, 1939—Rehearing denied June 7, 1939.*

ALVAH S. GREEN, and L. H. HANNA, (C. C. CRAIG, of counsel,) for appellants.

SAFFORD, SOULE, KRITZER & FULTON, for appellees.

Mr. JUSTICE FARTHING delivered the opinion of the court:

William Henry Oneale, a resident of Warren county, died testate on June 4, 1936, at the age of eighty-seven. He executed his last will on February 21, 1931. After providing for the payment of his just debts and funeral expenses, the will devised to his nephew, Ora Oneale, or his heirs, two described tracts of land containing about 80 acres. He devised an eighty-acre tract of land to his grandnephew, Keith Oneale, or his heirs. Seven clauses of the will made bequests of stock of the Tax Security Corporation to other nieces and nephews. He bequeathed five hundred dollars to the Salem Cemetery Association for the perpetual care of his cemetery lot. The residue of his estate was given to

Ora Oneale and Keith Oneale, and Glenn G. Watson was appointed executor. The will was duly proved and admitted to record, and thereafter, plaintiffs, who are seven nephews of the testator, filed their complaint in equity to set aside the will on the ground that the testator was mentally incompetent at the time he executed his will and that it had been procured by the undue influence and fraud of Glenn G. Watson. After issue was joined, a trial was had before the court without a jury and a decree was entered dismissing the complaint for want of equity. Plaintiffs have appealed directly to this court.

There was no proof that the will was procured as a result of the undue influence of Glenn G. Watson, and the only question presented by this appeal is whether the circuit court erred in finding that the testator was mentally competent to execute his will on February 21, 1931. The testimony is highly conflicting. Contestants called sixteen witnesses and proponents twenty.

The testator, hereafter called Oneale, lived on a farm consisting of 160 acres, four miles west of Roseville in Warren county. His wife had died in 1928 leaving no children. He was somewhat hard of hearing and read with the aid of glasses or a large reading glass. He employed Mrs. Cora Simmons and her daughter, Bonita, to keep house for him. This arrangement continued until 1932, when Mrs. Simmons moved away. Her daughter remained until 1936. Oneale's brother, E. J. Oneale, died on January 28, 1931. The Farmers & Merchants Bank of Roseville, in which Oneale was a stockholder, closed about the middle of February, 1931, and on February 21, 1931, he executed the instrument which is in controversy in this suit.

Contestants' testimony in substance shows that Oneale was driven to Roseville on the afternoon of February 21, 1931, by Fern Curtis, his grandniece. Her father carried the mail on the route which went by the Oneale farm. On the morning in question she took her father to deliver the

mail. They stopped at Oneale's and he asked her father to take him to Roseville that afternoon. Fern volunteered to call for him, since her father's automobile was not in running order. When she called for him Oneale was not quite ready. The inference to be drawn from Fern Curtis' testimony is that he went outside to take a drink of spirits. He then climbed into Fern's automobile and was driven to the home of Glenn G. Watson. She testified Oneale was so intoxicated when she left him at Watson's home that she refused to call for him later. She said he was irrational; that he mumbled and talked incoherently, and that he slumped in his seat and moved his hands "in a frantic sort of way." She believed testator was of unsound mind or memory at that time.

The will was executed in a back room of the Roseville post-office in the presence of Glenn G. Watson, Homer F. Kelly, George H. Brokaw, and Lamoine R. Ross. The latter three subscribed the will as attesting witnesses and testified when it was admitted to probate and signed an affidavit, which was filed with the county clerk, stating that testator was of sound mind and memory. However, the attesting witnesses testified in this proceeding that they had no opinion as to the testator's competency at the time he signed the will. They did not testify that he was of unsound mind at that time, but leave the impression that Watson did not fully explain that they were to witness a will and that the testator did not specifically request them to witness the execution of his will. Having read the testimony of the attesting witnesses, we are of the opinion they knew that W. H. Oneale was executing his last will, and that no fraud or overreaching was there practiced. It appears that Oneale came into the post-office with Watson and sat down near a sorting table. He permitted Watson, who had formerly worked in a bank in Roseville, to attend to the drafting of the will. Watson asked the witnesses to act as such. Testator sat quietly by until Watson laid the

paper on the sorting table. He then signed it and the witnesses attested it. These witnesses do not bear out the testimony of Fern Curtis that Oneale was then talkative and intoxicated.

Other witnesses testified for contestants that Oneale was filthy about his person; that he did not bathe regularly, and that he sometimes slept fully clothed. Some of his neighbors testified that he drank heavily; that he made wine in 50-gallon barrels, which he stored in a wine cellar; that he bought alcohol in gallon-cans and drank it straight or diluted with water, and that he kept whisky and alcohol hidden in the oats bin. Some of the witnesses testified that they saw Oneale intoxicated on several occasions. One neighbor testified that in the summer of 1934 he went with Oneale to look at a field of corn and discuss a course of action to be taken against chinch bugs, but Oneale was so drunk he fell into a ditch and had to be helped out. Our examination of all this testimony concerning testator's addiction to liquor fails to convince us that it impaired his mental functions, except when he had imbibed too freely. Most of the witnesses expressed the opinion that his mind was unsound when he had been drinking. The facts that his wife had died in 1928, and a bank had failed to his loss in 1931, were stressed as reasons for his using intoxicating liquor, but the evidence falls far short, except by inference, of showing that he was an alcoholic addict.

Contestants' evidence also showed that he did not properly care for his livestock and that some of it starved to death. It also appeared that he sold grain to his neighbors and let them pay for it according to weights made on their own scales and out of his presence. It is noteworthy that these same witnesses, when asked about particular transactions they had had with Oneale, always testified to facts showing he was well able to take care of himself. For example, Earl Lozier, who had lived as a tenant on testator's farm for four years·beginning in 1930, testified Oneale was

of unsound mind in 1930 and 1931, but, on cross-examination, he admitted working out a cash rent of $50 a year by doing repair work about Oneale's premises and at his direction. He and Oneale built a coal shed. Oneale had him shingle some of the sheds on the place and repair fences. He hauled manure and placed it in the garden at Oneale's direction. He and Oneale cut two trees into firewood. He did calcimining at his direction. Lozier borrowed $300 from Oneale, and signed a one-year six per cent note prepared by Oneale. This note was paid. Proponents' evidence tended to prove that Oneale was shrewd and well able to take care of himself. There is no showing that any one ever overreached him or took advantage of him. Proponents point to the fact that he was able to keep his estate intact through a period of economic depression, and for five years after he made his will, as strong evidence that he was competent. After he executed it he took the will to the Second National Bank of Monmouth for safe-keeping. He made deposits of money in this bank from 1932 to 1936. These deposits varied in amounts from $5.06 to $3998.25. One was for $2285.27, another for $938.95, and one for $609.15. On October 16, 1932, he signed an order for this bank to buy a three and one-fourth per cent United States government bond for $1000, and on April 20, 1935, he ordered $4000 of three per cent United States government bonds. A number of checks endorsed by Oneale, and his signature card with the Monmouth Bank, are also in evidence. On December 23, 1930, he loaned $3610 to Arthur S. Oneale, one of the appellants, on the security of a chattel mortgage, which he placed of record. This was hardly sixty days before he executed the will. He kept a diary, parts of which have been certified to this court. It shows two entries on the day he executed the will. It records the daily occurrences in his life. If he spent or received money, or went to town he would record it briefly. Sometimes the weather was the subject of an entry. A number of wit-

nesses testified that they had had business transactions with Oneale in his lifetime and they thought he was of sound mind and memory. They had sold him groceries for which he had paid cash, rented land from him or bought grain from him. The only liquor he was ever shown to have purchased was prescribed by a physician.

Appellants contend that they have proved by a preponderance of the evidence that the testator was incompetent at the time he executed his will on February 21, 1931, and that the chancellor erred in holding to the contrary. They point to the fact that the attesting witnesses testified in this suit that they had no opinion as to the testator's mental condition when he executed the instrument in question. However, their testimony at the trial conflicts with the affidavits they signed and filed with the county clerk after the probate of the will, and the chancellor was in better position to judge of their credibility than we are. The testimony of a subscribing witness who seeks to impeach the will should be received with caution and is rightly viewed with suspicion. (*Szarat* v. *Schuerr,* 365 Ill. 323, 326; *Beck* v. *Lash,* 303 id. 549; *Kuehne* v. *Malach,* 286 id. 120.) The attesting witnesses in this case did not testify that they thought the testator was incompetent when he signed the will, but simply that they had no opinion on that subject. They testified to no facts which would indicate that testator was either intoxicated or incompetent. Under these circumstances their testimony did not materially aid the contestants.

Appellants also place great reliance on the testimony of Fern Curtis, who was the only witness who testified that testator was intoxicated on February 21, 1931. Her testimony finds little support in the record. No one testified that Oneale had been drinking before she called to take him to Roseville, and the only thing to show that he had been drinking was her statement that she smelled alcohol on him, and that he excused himself and went out of the house presumably to take a drink just before he got in her

car. It is difficult to see how the testator could have been so very drunk a few minutes later when she let him out at the home of Glenn Watson. The mother of this witness would benefit by setting aside the will, and the chancellor had a right to consider this in passing on her credibility.

Appellants seem to argue that Glenn G. Watson was in a confidential relation with the testator and that the burden was upon him to show that the will was properly executed. There is no evidence, whatever, of any fraud or undue influence on his part. Neither is it shown that a confidential relation existed between him and Oneale. It is suggested that Watson was the testator's adviser but the suggestion is not borne out by the record. The fact that he was made executor in the will, and would be entitled to commissions on the money he handled, does not, alone, raise a presumption of undue influence. *Williams* v. *Ragland,* 307 Ill. 386.

Appellants urge that they have shown such continued and prolonged use of alcohol as to render the testator incompetent to make a will. Eccentricity, uncleanliness, slovenliness, neglect of personal appearance and clothing, offensive and disgusting habits or conduct, do not constitute or establish the want of testamentary capacity or unsoundness of mind. (*Long* v. *Brink,* 353 Ill. 549, 555; *Estes* v. *Clark,* 317 id. 585.) Incompetency to make a will cannot be established by proof of the use of intoxicating liquor, unless such use is shown to have existed sufficiently to have impaired the testamentary capacity of the testator, or that such testamentary capacity was impaired by reason of intoxication existing at the time the will was made. (*Long* v. *Brink,* *supra; Moriarity* v. *Palmer,* 286 Ill. 96.) The proof in this case falls far short of that required. It does not appear that the testator was intoxicated when he made the will, nor does it appear that by reason of chronic addiction to the use of alcohol his mind had become so impaired as to render him incompetent to make a will. In order to make a valid will, the testator must have been capable of knowing the

extent of his property and the natural objects of his bounty and the nature and effect of the act of executing his will. (*Hoskinson* v. *Lovelette,* 365 Ill. 21.) We are of the opinion that such proof was made. The chancellor heard and saw the witnesses as they testified. The testimony was highly conflicting and it was his province to determine, in the first instance, the credibility to be given to each witness. We cannot say that he erred in reaching the conclusion that he did.

The decree of the circuit court of Warren county is affirmed.

*Decree affirmed.*