# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Estate of Harn*, 2012 IL App (3d) 110826

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF LARRY W. HARN, Deceased (Scott Harn, Petitioner-Appellant, v. Danielle C. Bachman, Executor of the Estate of Larry W. Harn, Deceased, Danielle C. Bachman and Katina Ann Livermore, Respondents-Appellees). |
| District & No. | Third District<br>Docket No. 3-11-0826 |
| Filed<br>Modified upon denial<br>of rehearing | July 3, 2012<br><br>August 13, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a will contest, the entry of summary judgment against petitioner's claim that decedent lacked testamentary capacity was reversed on the ground that the evidence presented raised a genuine issue of material fact as to decedent's testamentary capacity to execute the will at issue. |
| Decision Under Review | Appeal from the Circuit Court of McDonough County, No. 09-P-22; the Hon. Richard H. Gambrell, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; case remanded. |

| Counsel on Appeal | Stanley L. Tucker (argued), of Hartzell, Tucker & Hartzell, of Carthage, for appellant. |
|---|---|
| | Thomas W. McIntire (argued), of Barash & Everett, LLC, of Galesburg, and Bruce J. Biagini, of Flack, McRaven & Stephens, of Macomb, for appellees. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion. Justices McDade and O'Brien concurred in the judgment and opinion. |

## OPINION

¶ 1    Petitioner, Scott Harn (Scott), filed a petition to contest the 2004 will of his father, decedent, Larry W. Harn, alleging claims of undue influence and lack of testamentary capacity. The administrator of the estate, Danielle Bachman, filed a motion for summary judgment as to both claims. After a hearing, the trial court granted the motion. Scott appeals the trial court's ruling as to his testamentary-capacity claim only.[1] We affirm the judgment of the trial court as to Scott's undue-influence claim, which was not contested on appeal, reverse the trial court's judgment as to Scott's testamentary-capacity claim, and remand this case for further proceedings.

¶ 2                                                   FACTS

¶ 3    Decedent lived in McDonough County in Blandinsville, Illinois, and passed away in March 2009. During the course of his lifetime, decedent was married and divorced three times and had three children: Scott Harn and Katina Livermore, as a result of one marriage, and Danielle Bachman, as a result of another. In 1998, decedent executed a will, in which he divided up his property between all three of his children. However, in 2004, after decedent had a falling out with Scott, he executed another will (the will or the 2004 will), which is the subject of the instant will contest. In the 2004 will, decedent gave $1 to Scott and divided up the rest of his estate between Katina and Danielle. Scott and decedent later reconciled in about 2006. Although there is some indication in the record that decedent wanted to put Scott back into his will before he died, that was never done.

¶ 4    After decedent passed away, Danielle was appointed independent administrator of his estate. In August 2009, Scott filed the instant petition to contest the 2004 will. In the petition,

---

[1]Scott does not expressly concede or abandon his undue-influence claim on appeal. However, he has made no specific argument as to that claim.

Scott alleged, among other things, that decedent lacked testamentary capacity to make the 2004 will in that: (1) decedent was physically ill and suffering from alcoholism; (2) decedent's alcoholism caused a disease of the mind; (3) decedent suffered from oxygen depravation and loss of function and control of his bodily and mental functions; (4) decedent did not have the ability to understand that he was providing for the disposition of his property after his death; (5) decedent did not have the ability to know the nature and extent of his property; (6) decedent did not have the ability to know the natural objects of his bounty; and (7) decedent did not have the ability to know the manner in which the will disposed of his property. Danielle, as administrator of the estate, filed a motion for summary judgment on Scott's will contest. Attached to the motion were numerous supporting documents. Scott opposed the motion for summary judgment and filed supporting documents in opposition to the motion.

¶ 5 In June and July 2011, a hearing was held on the motion for summary judgment. Although some of the above-referenced documents were filed during the course of the hearing, at the time the trial court made its ruling, it had before it the pleadings, the written arguments of the attorneys, the oral argument of the attorneys, and numerous depositions and affidavits. The evidence presented in the summary-judgment proceeding relative to the issue of testamentary capacity can be summarized as follows.

¶ 6 Scott testified in his deposition that he and decedent did not have a good relationship in 2004 and did not get along at the time the will was drafted. Scott estimated that he saw decedent less than six times that year and did not have any contact with decedent from March through July 2004. Scott did not have contact with decedent on the date the will was executed and did not know anyone who had spoken to decedent on that date. According to Scott, on the occasions that he spoke with decedent, decedent appeared or sounded "ill" from alcohol, was noticeably intoxicated a lot of the time, and would become very angry and agitated. Scott did not remember, however, if he saw decedent noticeably drunk in 2004 but stated that at times when he spoke to decedent on the phone, decedent slurred his words and was intoxicated. Scott had no knowledge of whether decedent was drunk when he made the 2004 will. Scott did not observe the decedent lose control of his bodily functions in 2004. In Scott's opinion, when he saw or spoke to the decedent in 2004, the decedent was mentally impaired.

¶ 7 Prior to 2004, when Scott was in high school, the decedent was in the hospital with a severe lung infection due to heavy smoking. His symptoms throughout that time period were shortness of breath and alcohol withdrawal. Scott stated that the decedent was like that when he lived with him when he was a child in the 1990s and probably earlier than that. Scott witnessed the decedent drink all the time when he was growing up. When Scott spoke to the decedent in the years leading up to 2004, the decedent expressed he was experiencing a lack of oxygen or that his lungs hurt and was limited on what he could do throughout those years. Scott did not specifically remember the decedent saying that in 2004, however.

¶ 8 Joe O'Donnell testified in his deposition that he had been a licensed attorney in Illinois since 1984. Over the course of his career, Joe had drafted about 15 wills a year. Joe was a friend of decedent and also performed legal work for him on occasion. Joe represented decedent in a prior divorce and drafted the 1998 will and the 2004 will. In the 1998 will,

decedent left everything to his three children. However, in the 2004 will, decedent cut Scott out of the will and divided everything up between Katina and Danielle.

¶ 9        On May 14, 2004, Joe met with decedent regarding the drafting of a new will. Decedent brought into Joe's office a handwritten note listing the changes that he wanted made. The note indicated that decedent wanted to remove Scott from the will and have everything divided up between Katina and Danielle. Joe did not see decedent write the note but believed that the note was in decedent's handwriting. Joe discussed with decedent the changes that decedent wanted to make to the will and the reasons for those changes. Decedent told Joe that he had a falling out with Scott. Decedent stated further that Katina was well off and that he did not know if she would want any of his estate, but he wanted to make sure that she was aware that he recognized her as a person he wanted to be included in his estate. According to Joe, decedent appeared to be clear minded and sober and not anxious or pressured. Decedent did not appear to have any doubt, misgivings, or reservations about the way he wanted things set up in his will. As a friend of decedent, Joe felt that he would have been able to tell if decedent did not feel at ease with what he wanted to do in the will.

¶ 10       Joe met with decedent again on May 17, 2004, and the 2004 will was executed on that date. Decedent appeared to be in good health at that time. The meeting took 15 to 30 minutes, and Joe went over the will with decedent. As far as Joe knew, decedent walked into the office on that date and the prior date, was alone, and there was nothing about decedent that was out of the ordinary. Decedent was not intoxicated. Joe did not see how decedent got to the office and did not know if someone drove decedent to the office.

¶ 11       Between the period of May 14 and May 17, 2004, Joe had no reason to believe that decedent did not know the nature and extent of his assets or debts or who his children or grandchildren were. Decedent was about 55 years old at the time and seemed to be in good health and mental status. Decedent knew that he was signing his will and reviewed it before he signed it. Joe was paid $100 by decedent for preparing the 2004 will. During his testimony, Joe stated that he was familiar with the requirements of testamentary capacity and opined that he believed that decedent possessed sufficient testamentary capacity to execute the 2004 will. Joe stated that when a person came into his office for a will, he would usually meet with the person two or three times and would try to be alert to any statements or behaviors that would suggest that the person had a possible cognitive or volitional problem.

¶ 12       Joe acknowledged that decedent had a problem with drinking over the years. According to Joe, decedent drank a lot in the 1980s and 1990s. Joe's personal knowledge of decedent's drinking stopped around 1995 because Joe stopped drinking at that point. Joe did not know if decedent had any alcohol-related health issues but did not believe that decedent had any alcohol-related legal issues.

¶ 13       Joe signed an affidavit, which was submitted with the motion for summary judgment. Joe's statements in the affidavit were similar to his testimony in the deposition. A copy of decedent's handwritten notes was attached to Joe's affidavit as an exhibit.

¶ 14       Rita O'Donnell testified that she was the wife of attorney Joe O'Donnell and that she worked at Joe's office as a paralegal at the time the 2004 will was prepared and executed. In May 2004, decedent came into the office and told Rita that he wanted to set up an

-4-

appointment to have a will made. Decedent returned on May 14, 2004, to meet with Joe. Decedent brought with him some handwritten notes of what he wanted done in the will. Rita looked over the notes, asked decedent some questions, made some notes of her own on the same paper, and had decedent take the notes into his meeting with Joe. Rita did not know who wrote the notes.

¶ 15    Decedent returned on May 17, 2004, to execute the will. Decedent walked into the office and, according to Rita, was alert, oriented, and in a neutral mood. Rita did not notice anything out of the ordinary with decedent that day. Decedent did not appear to be under the influence of alcohol or drugs, and Rita did not smell an odor of alcohol about decedent's breath. Decedent did not discuss with Rita his reasons for cutting Scott out of the will.

¶ 16    Rita also signed an affidavit, which was submitted as part of the summary-judgment proceeding. The affidavit stated, among other things, that Rita believed that the handwriting on the notes that decedent brought with him into the office in May of 2004 looked similar to the handwriting of decedent. A copy of the handwritten notes was attached to Rita's affidavit as an exhibit.

¶ 17    Brendon Bachman stated in his affidavit that he was the ex-husband of Danielle and that he and Danielle were married from February 2008 until summer 2009. Brendon was acquainted with decedent for several years before decedent's death. For a part of 2008 and 2009, decedent lived with Brendon and Danielle at their home in Jacksonville, Illinois, until decedent passed away. According to Brendon, Danielle told him during the marriage that decedent was not her biological father and that she and her mother had known this for several years. Danielle also told Brendon that she met her real father and was pleased that she looked like him. Prior to their divorce, Danielle told Brendon that she had to divorce him before decedent died so that Brendon would not be able to get her share of the estate. According to Brendon, during the time that decedent lived with them, Danielle did everything she could to keep decedent isolated from the remainder of the family and was very upset on one occasion when Scott's wife took decedent to the doctor. Danielle wanted to be executor of decedent's estate and to have power of attorney. Danielle told Brendon that she was afraid that Scott was trying to get into the will and that if he did, she would receive nothing when decedent died.

¶ 18    Jack Harn, Jr., stated in his affidavit that he was decedent's brother and that he had known decedent for all of decedent's life. Jack received a bachelor's degree in pharmacology in 1967 and worked as a pharmacist. Jack lived in Macomb, Illinois, and saw decedent at least once a month, except when decedent lived with Danielle for a few months in 2008 and 2009. According to Jack, decedent was an alcoholic for most of his adult life and continually after about 1980 or 1981. In Jack's opinion, decedent would not have had the capacity to appreciate or conduct any normal relationship with his children or understand that they were or should have been the natural objects of his affection or bounty at any time after 1980 or 1981. Decedent frequently exhibited irrational rage and anger at anyone around him, including Scott.

¶ 19    Katina Livermore stated in her affidavit that she was decedent's daughter. During the time period from March through July 2004, Katina saw decedent only twice. Katina, at no

-5-

time, interacted with decedent to secure any changes to decedent's will or in the execution of decedent's will.

¶ 20    Danielle stated in her affidavit that she was decedent's daughter. Danielle lived with her mother and decedent for six years growing up. After that time, Danielle's contact with decedent was intermittent. During 2004, Danielle lived with another family about 50 miles away and did not live with decedent. From March to July 2004, Danielle saw decedent about 12 times and had contact with decedent over the phone. During all of the times in which Danielle had contact with decedent, decedent appeared to be coherent, in good health, and not under the influence of alcohol. Danielle turned 18 on May 8, 2004, just nine days after the 2004 will was executed. On May 30, 2004, less than two weeks after decedent executed the 2004 will, decedent went to Danielle's high school graduation ceremony. At the ceremony, decedent appeared to be coherent, in good health, and not under the influence of alcohol. A picture of decedent at the graduation ceremony was attached to Danielle's affidavit as an exhibit.

¶ 21    Deanna Stilz stated in her affidavit that she was married to decedent from 1982 to 1992. During the marriage, Deanna and decedent had one child, Danielle, who was born in May 1986. When Deanna and decedent were divorced, in the divorce decree, the court found that Danielle was born during the marriage.

¶ 22    At the conclusion of the summary-judgment hearing, the trial court took the case under advisement. In October 2011, the trial court issued a letter ruling granting the motion for summary judgment as to both of Scott's claims. A written order followed. Scott appealed to challenge the trial court's ruling but only as to his claim of testamentary capacity.

¶ 23                                                    ANALYSIS

¶ 24    On appeal, Scott argues that the trial court erred in granting Danielle's motion for summary judgment. Scott asserts that a genuine issue of material fact exists as to his testamentary-capacity claim and that it precludes a grant of summary judgment for Danielle. Danielle argues that the trial court's ruling was proper and should be affirmed.

¶ 25    The purpose of summary judgment is not to try a question of fact, but to determine if one exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). Summary judgment should be granted only where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2008); *Adams*, 211 Ill. 2d at 43. Summary judgment should not be granted if the material facts are in dispute or if the material facts are not in dispute but reasonable persons might draw different inferences from the undisputed facts. *Adams*, 211 Ill. 2d at 43. Although summary judgment is to be encouraged as an expeditious manner of disposing of a lawsuit, it is a drastic measure and should be allowed only where the right of the moving party is clear and free from doubt. *Adams*, 211 Ill. 2d at 43. In appeals from summary judgment rulings, the standard of review is *de novo*. *Adams*, 211 Ill. 2d at 43.

¶ 26    "Every person who has attained the age of 18 years and is of sound mind and memory

has power to bequeath by will the real and personal estate which he has at the time of his death." 755 ILCS 5/4-1 (West 2008). Each person is presumed under the law to be sane for the purpose of making a will, until the contrary is proven. *Shevlin v. Jackson*, 5 Ill. 2d 43, 47 (1955). "To set aside a will on the grounds of lack of testamentary capacity, the petitioner must demonstrate that at the time the will was executed the testator lacked sufficient mental ability to know he was making a will, to know and remember the natural objects of his bounty, to comprehend the character and extent of his property and to make disposition of his property according to a plan formed in his own mind." *In re Estate of Roeseler*, 287 Ill. App. 3d 1003, 1013 (1997); see also *Anthony v. Anthony*, 20 Ill. 2d 584, 588 (1960). Proof of a testator's lack of testamentary capacity, to be relevant, must pertain to at or near the time the will was made. *In re Estate of Kietrys*, 104 Ill. App. 3d 269, 273-74 (1982). A lay witness may give his or her opinion as to the soundness of the testator's mind, as long as that witness had a sufficient opportunity in a conversation or some other transaction to form that opinion. *In re Estate of Kietrys*, 104 Ill. App. 3d at 274.

¶ 27    It is well settled that if a person has sufficient mental capacity to transact ordinary business and act rationally in the ordinary affairs of life, he or she has sufficient mental capacity to dispose of property by will. *Shevlin*, 5 Ill. 2d at 47-48; *In re Estate of Kietrys*, 104 Ill. App. 3d at 274. However, a testator need not be of absolutely sound mind in every respect in order to have sufficient testamentary capacity to make a will. *Anthony*, 20 Ill. 2d at 588. Thus, "[e]ccentricity, uncleanliness, slovenliness, neglect of personal appearance and clothing, offensive and disgusting habits or conduct, do not constitute or establish the want of testamentary capacity or unsoundness of mind." *Gilbert v. Oneale*, 371 Ill. 427, 434 (1939). Nor does the testator's use of alcohol. See *Shevlin*, 5 Ill. 2d at 47; *In re Estate of Kietrys*, 104 Ill. App. 3d at 273. "Incompetency to make a will cannot be established by proof of the use of intoxicating liquor, unless such use is shown to have existed sufficiently to have impaired the testamentary capacity of the testator, or that such testamentary capacity was impaired by reason of intoxication existing at the time the will was made." *Gilbert*, 371 Ill. at 434.

¶ 28    In the present case, the evidence presented in the summary-judgment proceeding was sufficient to create a genuine issue of material fact as to decedent's testamentary capacity to make the 2004 will. In support of Scott's position, Scott's deposition and the affidavit of Jack Harn, Jr., provided evidence, which, if believed, tended to show that decedent suffered from chronic alcoholism and lacked the sufficient testamentary capacity to execute the 2004 will. The trial court did not strike that evidence and apparently considered it in ruling upon the motion for summary judgment. However, in support of Danielle's position, the affidavit of Danielle and the affidavits and depositions of Joe and Rita O'Donnell provided evidence, which, if believed, tended to show that decedent had sufficient testamentary capacity to execute the 2004 will. Because this was a summary-judgment proceeding, it was not for the trial court to resolve the question of material fact that had been established. See *Adams*, 211 Ill. 2d at 42-43. The trial court's role was merely to determine that such a question existed. See *Adams*, 211 Ill. 2d at 42-43. Summary judgment, therefore, should not have been granted. See *Adams*, 211 Ill. 2d at 43. In ruling in this manner, however, we note that we do not mean to indicate what the result will be after a trial on the merits.

¶ 29    For the foregoing reasons, we affirm the trial court's grant of summary judgment as to Scott's undue-influence claim, reverse the trial court's grant of summary judgment as to Scott's testamentary-capacity claim, and remand this case for further proceedings.

¶ 30    Affirmed in part and reversed in part; case remanded.